In re Marion Theresa MILLER, Debtor.

COMMERCIAL BANKING
CORP., Plaintiff,

v.

Albert J. MILLER and Marion T.
Miller, Defendants.

Bankruptcy No. 88–11827S.
Adv. No. 88–0869S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Sept. 27, 1988.

Susan L. DeJarnatt, Community Legal Services, Inc., Philadelphia, Pa., for defendant-debtor.

Arnold Lieberman, Philadelphia, Pa., for plaintiff.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

The Debtor and Defendant in this adversary proceeding, MARION THERESA MILLER (hereinafter referred to as "the Debtor"), takes up the suggestion that we offered to a very different debtor in *In re Telephonics, Inc.*, 85 B.R. 312, 318 n. 3 (Bankr.E.D.Pa.1988), to remove a state court proceeding in which a debtor was in the process of attacking a judgment entered therein to this court if the debtor wishes us to question the validity of the judgment. Applying the equitable principles in favor of allowing parties to defend causes on their merits which predominates consideration of such matters under applicable federal law, we grant the Debtor's motion.

The Debtor filed the underlying Chapter 13 bankruptcy case underlying this controversy on May 25, 1988. The day before, on May 24, 1988, she had filed a Petition to Strike/Open a Judgment entered in favor of COMMERCIAL BANKING CORPORATION (hereinafter "the Plaintiff") in the Philadelphia Court of Common Pleas at October Term, 1987, No. 879 (hereinafter "the C.P. Case"). On June 27, 1988, she removed the C.P. Case to this court pursuant to Bankruptcy Rule (hereinafter "B.Rule") 9027(a).

Upon being advised of the removal and its designation by this court as the above-captioned adversary proceeding, we entered an Order of June 30, 1988, directing that any motion to remand be filed on or before July 20, 1988, and tentatively scheduling a trial, in the event no such motion was filed or if same were denied, on August 23, 1988. No motion to remand was filed, and therefore the "Petition" attacking the judgment came before us for a hearing on August 23, 1988.

The Debtor and Louis D. Einstein, the Plaintiff's "officer," testified at the hearing. We had the Brief filed by the Debtor in state court prior to removal and a responsive Brief filed by the Plaintiff on the date of the hearing at our disposal. We allowed the Debtor and the Plaintiff, respectively, until September 2, 1988, and September 13, 1988, to file supplemental Briefs, requesting them to address, in particular, the issue of whether we should apply state law or federal law in determining whether to accord the Debtor her requested relief from the judgment.

■ We agree with the Debtor's analysis, concluding that federal law applies. B.Rule 9027(h) specifically states that "[t]he rules of Part VII [*i.e.*, the 7000 series of the Bankruptcy Rules] apply to a claim or cause of action removed to a district court from a federal or state court and govern procedure after removal." We believe that the term "procedure," in the context of this rule, refers to both procedural and substantive law. This result appears logical, because the removed action, unless remanded, is no longer, in any sense, a proceeding in state court. *Cf. In re United Church of the Ministers of God*, 74 B.R. 271, 276 (Bankr.E.D.Pa.1987). It must be decided, by the federal court to which it is removed, precisely as if it had been filed and litigated in the federal court since its onset.

In addressing the issue of what law should be applied in an action removed under the general removal statutes, 28 U.S.C. §§ 1441, et seq., the Supreme court has squarely held that "once a case has been removed to federal court, it is settled that federal rather than state law governs the future course of proceedings, ...." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters, etc., Local 70*, 415 U.S. 423, 437, 94 S.Ct. 1113, 1123, 39 L.Ed.2d 435 (1974). This is not surprising, because the very purpose behind the removal statutes is to permit a party to bring to the federal courts a proceeding implicating federal law

in order to have it decided by a federal court applying federal law.

This principle has been applied by bankruptcy courts presented with actions removed to the bankruptcy courts under those statutory provisions allowing removal of proceedings to bankruptcy court, *i.e.,* the present 28 U.S.C. § 1452, and its predecessor, 28 U.S.C. § 1478, and B.Rule 9027. *Granny Goose* is expressly followed by the court in *In re Massey,* 3 B.R. 110, 111 (Bankr.D.Colo.1980).

Even more directly on point are two decisions by our predecessor, the Honorable William A. King, Jr., in *In re Vic Snyder, Inc.,* 23 B.R. 679 and 22 B.R. 332 (Bankr.E. D.Pa.1982). In the August decision, Judge King holds that federal procedural law must be applied to a case removed from state court after the filing of petition attacking a default judgment. 22 B.R. at 334. However, perhaps even more significant to our purpose here, in the October decision, Judge King utilizes federal authority in proceeding to set aside the default judgment in issue. 23 B.R. at 681. We believe that, in so doing, Judge King correctly applied the applicable law as enunciated by the Supreme Court in *Granny Goose. Accord, In re Mahoney, Samuel v. Mahoney,* Case No. 86–07841, Adv. No. 87–0239, Bench op. at 11. (Bankr.D.N. J. June 18, 1987). We shall therefore apply federal substantive law in determining whether the facts set forth hereinafter, as developed at the brief hearing on August 23, 1988, justify granting the Debtor relief from the Plaintiff's state-court default judgment.

The first of the facts developed at the hearing were that the Debtor, a divorcee who receives Social Security disability benefits as the result of a heart-valve deficiency and arthritis, and her then-husband, Albert J. Miller, made a loan on June 8, 1973, from Industrial Valley Bank and Trust Co. (hereinafter "IVB") secured by a mortgage on their jointly-owned home at 326 North Simpson Street, Philadelphia, Pennsylvania, in the amount of $2,286.00, repayable in 60 monthly installments of $38.10. The Debtor admitted that marital discord, which caused her to leave the premises for some period, probably resulted in her ex-husband's not making payments and, consequently, a delinquency. She herself did not work and had no resources with which to make payments.

IVB is no longer in business. The account in question was apparently assigned to the Plaintiff for some unidentified consideration some time shortly after IVB's demise. The first record we have of the alleged status of this account begins with the first entry, of June 18, 1981, on the Plaintiff's books in the amount of $2,451.25. This figure, it should be noted, is inexplicably more than the total amount of the original loan. In late 1981, the Debtor arranged with the Plaintiff to pay $30.00 monthly on this obligation, and did so until November, 1982, when the payments were reduced to $20.00 monthly. After years of payments at this rate, the monthly payment figure was increased to $30.00 monthly in November, 1985, and thereafter to $40.00 monthly in July, 1986, through the last payment in December, 1986. The sum of all of the Debtor's payments was, by our calculation, $1,390.90. However, the principal balance of the loan, on the Plaintiff's books, was reduced to only $1,964.01, a reduction of but $487.24 from the opening balance, because of the allocation of the amount between about $10.00 and $13.00 from each payment, or a total of $902.66, to "interest." In his testimony, Mr. Einstein, consistently but equally as lacking in specifically as these records, attributed the slow reduction of the principal balance to application of certain sums to "past-due interest." No more specific explanation or calculations of this "interest" were offered.

In December, 1986, the Debtor's brother apparently convinced her that she had paid for the obligation at least twice over, and, following his advice, the Debtor ceased making payments. On October 8, 1987, the Plaintiff instituted the C.P. Case, in the form of an action in mortgage foreclosure, against the Debtor and her ex-husband.

Although the original copy of the Complaint filed of record was complete, the Debtor contended that the copy of the Com-

plaint served upon her did not include the second page of the original. The first page of the Complaint set forth only the addresses of the parties [1] and the execution of a mortgage in favor of IVB. The allegations of a default in payments, the recitation of the amount due, and a prayer for judgment in the amount of $2,032.75 were all set forth exclusively on the second page of the Complaint.

Attached as exhibits to the Complaint were the following letters: (1) A Notice of Intention to Foreclose Mortgage, dated March 19, 1987, in colorable compliance with Act No. 6 of 1974, 41 P.S. § 101, et seq. (hereinafter "Act 6"); [2] and (2) A Notice of Homeowners' Emergency Mortgage Assistance Act of 1983, dated May 9, 1984, in colorable compliance with Act No. 91 of 1983, 35 P.S. § 1680.401c, et seq. (hereinafter "Act 91"). [3]

The Debtor testified that, upon being served with the Complaint in late October, 1987, she called the Plaintiff's counsel. He advised her that she "had better get a lawyer." The Debtor alleged rather vague attempts at seeking legal counsel, indicating that she was severally hampered by an inability to pay for same.

On December 17, 1987, a default judgment was entered against the Debtor when she failed to responsively plead to the Complaint. It was obviously the execution upon her home to satisfy this judgment that spurred her to make further efforts to locate free legal counsel. She is presently represented by Community Legal Services, Inc., which provides free representation to indigent residents of the City of Philadelphia in civil cases.

The Debtor's counsel focuses on three defects in the process which she contends justify our granting the Debtor relief from the Plaintiff's default judgment: (1) The Complaint served upon the Debtor was defective because the second page was missing; (2) The Act 6 letter erroneously recited the period in which the loan payments were allegedly in default; and (3) The Act 91 letter was sent at a time period too remote from the institution of the litigation to be effective.

■ We will discuss the merit of each of these allegations in turn hereinafter. However, at the outset, we note an underlying principle which appears again and again in the decisions of the Third Circuit Court of Appeals considering motions seeking relief from default judgments: "As a general matter, this court does not favor defaults and doubts should be resolved in favor of setting aside the default and reaching the merits." *Zawadski DeBueno v. Bueno Castro,* 822 F.2d 416, 420 (3d Cir.1987). *See also Gross v. Stereo Component Systems, Inc.,* 700 F.2d 120, 122 (3d Cir.1983); *Feliciano v. Reliant Tooling Company, Ltd.,* 691 F.2d 653, 656 (3d Cir.1982); *Farnese v. Bagnasco,* 687 F.2d 761, 764 (3d Cir.1982); *Medunic v. Lederer,* 533 F.2d 891, 893–94 (3d Cir.1976); and *Tozer v. Charles A. Krouse Milling Co.,* 189 F.2d 242, 245–46 (3d Cir.1951).

The application of federal law to this controversy bears at least a certain degree of significance, because this principle rarely appears in the Pennsylvania cases con-

---

**1.** We note that the address of Albert J. Miller was alleged to be 326 North Simpson Street, Philadelphia, Pennsylvania. The Debtor testified that he had resided in the Harrisburg area for some time. Therefore, service of the Complaint upon him at that address appears to be defective. The Debtor would appear to have standing to raise this issue as well as the issues discussed herein to overturn the judgment as to her ex-husband. *Cf. Four States Builders v. O'Neil,* 9 Pa.S. & C.3d 755 (Phila.Co.C.P.1978); and *First Pennsylvania Bank v. Selser,* 9 Pa.D. & C.3d 89 (Phila.Co.C.P.1979) (state law cases, but factually analogous). However, she did not attempt to do so here.

**2.** This law requires, *inter alia,* that a mortgagee receive notice and a right to cure any alleged delinquency before the mortgagee may commence an action to foreclose upon a residential mortgage obligation. *See In re Mosley,* 85 B.R. 942 (Bankr.E.D.Pa.1988); and *In re Schwartz,* 68 B.R. 376, 377–79 (Bankr.E.D.Pa.1986).

**3.** This law permits a homeowner faced with foreclosure to obtain a loan from the state to cure the delinquency and retain the home. The mortgagee must notify the homeowner of the right to apply for this loan and allow the application procedure to run its course prior to proceeding with a foreclosure action. *See In re Watts,* 76 B.R. 390, 393–94 (Bankr.E.D.Pa.1987).

cerning attempts to obtain relief from default judgments. To the contrary, many of these cases repeatedly hold, as the Plaintiff suggests in his initial Brief, that a petition to open a judgment may be granted only if it meets each prong of a tripartite test, *i.e.*, the petition must itself be timely in reference to the date of default, it must set forth a good reason for the delay in responding to the complaint which led to the default, and it must set forth a meritorious defense. *See generally,* 12 STANDARD PA.PRAC.2d 76–118 (1983). *See, e.g., Balk v. Ford Motor Co.,* 446 Pa. 137, 141, 285 A.2d 128, 131 (1971); and *Kraynick v. Hertz,* 443 Pa. 105, 111, 277 A.2d 144, 147 (1971). Thus, a delay of but twenty-seven (27) days in filing a petition to open a default after its entry was held fatal to the petition in *Texas & Block House Fish & Game Club v. Bonnell Run Hunting & Fishing Corp.,* 388 Pa. 198, 203–04, 130 A.2d 508, 511 (1957), despite apparent satisfaction of the other criteria. Timely petitions have been denied solely because the explanation for allowing a default to be entered was deemed insufficient. *See, e.g., Epstein v. Continental Bank & Trust Co.,* 260 Pa.Super. 522, 394 A.2d 1049 (1970). This mechanical approach to consideration of such matters has been criticized and has been properly rejected in the most thoughtful Pennsylvania decisions in this area. *See, e.g., Provident Credit Corp., v. Young,* 300 Pa.Super. 117, 129–31, 446 A.2d 257, 263–64 (1981) (per SPAETH, J.). However, as the dissent (per CAVANAUGH, J.) in the *Young* case points out, the mechanical approach requiring strict satisfaction of each prong of the tripartite test has, we believe most unfortunately, appeared in many decisions by Pennsylvania's appellate courts in deciding such matters. *Id.* at 300 Pa.Super. at 131–42, 446 A.2d at 265–70.

In ruling on motions seeking relief from judgments, the Court of Appeals has, similar to the Pennsylvania tripartite test, developed its own set of "considerations," which include the following:

1. Whether the plaintiff will be prejudiced;

2. Whether the defendant has a meritorious defense; and

3. Whether culpable conduct of the defendant led to the default.

*See also, e.g., Emcasco Insurance Co. v. Sambrick,* 834 F.2d 71, 73 (3d Cir.1987); *Zawadski DeBueno, supra,* 822 F.2d at 419–20 (3d Cir.1987); and *Feliciano, supra,* 691 F.2d 656. It may be significant to note, however, that the Court, in *Emcasco,* articulates a fourth criterion: "the effectiveness of alternative sanctions." 834 F.2d at 73. This suggests that federal courts should, when feasible, develop alternatives to declining to allow a party to defend litigation on its merits when that party seeks to avoid entry of a default judgment.

We perceive a difference, at least in tone, between the approach of the Court of Appeals, which analyzes the above "considerations" in a context of the equitable nature of a motion attacking a judgment and expresses a distinct preference for hearing a case on its merits, and the approach of the Pennsylvania state courts, which have often ignored the appropriate reasoning process employed by the *Young* majority and hardened the equitable considerations into a rigid mold which works directly contrary to the principle of preferring decision-making on the merits. We therefore believe that there is a noticeable difference in the reception to motions seeking relief from judgments under principles of federal law as opposed to those presented to the Pennsylvania state law. It is thus certainly of benefit to the Debtor that federal law must be applied to this controversy.

■ Considered under principles of federal law, we have little hesitancy in setting aside the Plaintiff's judgment on a number of grounds. The entire controversy leading up to the entry of the default judgment presents the element of the Plaintiff's oppression of an ill and impoverished woman, unschooled in legal matters, at a time when she was unrepresented by counsel. Consequently, the Plaintiff was able to convince her to pay for literally decades on an obligation owed to an entity which she has outlived and which she was simply unable

to pay due to forces beyond her control. *Compare In re Souders,* 75 B.R. 427, 429–31, 440 (Bankr.E.D.Pa.1987). The "common sense" advice of her brother that she must have paid the obligation twice over in the thirteen years between the making of the loan and her last payment on this obligation is, if anything, more convincing than Mr. Einstein's vague claims that the Plaintiff is entitled to an endless stream of "interest." *Cf. In re Jordan,* 91 B.R. 673, 679–81 (Bankr.E.D.Pa.1988); and *Souders, supra,* 75 B.R. at 438.

We are more impressed with the broad equitable aspects of the Debtor's stance in this proceeding vis-a-vis the Plaintiff than with the rather technical defects in the state-court process which her counsel emphasizes in seeking relief from the judgment. Of those three defects which counsel had identified, we are most impressed with the contention that the Complaint received was incomplete.

Without its second page, the Complaint articulated neither a claim nor a demand. At best, a default judgment is an admission that what is stated in the Complaint is true and what is demanded therein is confessed to be due. *See Ohio C.R.R. v. Central Trust Co. of N.Y.,* 133 U.S. 83, 91, 10 S.Ct. 235, 237, 33 L.Ed. 561 (1890); *Thomson v. Wooster,* 114 U.S. 104, 113–14, 5 S.Ct. 788, 792–93, 29 L.Ed. 105 (1884); *Cragin v. Lovell,* 109 U.S. 194, 199, 3 S.Ct. 132, 134, 27 L.Ed. 903 (1883); *Nishimatsu Construction Co. v. Houston National Bank,* 515 F.2d 1200, 1206 (5th Cir.1975); *Robinson v. Griffith,* 108 F.R.D. 152, 156 (W.D. La.1985); and *Kelley v. Carr,* 567 F.Supp. 831, 840–41 (W.D.Mich.1983).

Obviously, the contents of the Complaint actually served upon the Debtor are far more significant than the contents of the original, complete Complaint. It is the copy served upon the Debtor which provides her with the notice of the claims against her. We credit the Debtor's testimony that the Complaint received by her was, in fact, missing the second page. Therefore, we reject the Plaintiff's contention that we must impute the contents of the Complaint filed of record into the defective copy received by the Debtor.

However, we further note that the Complaint, even with its second page intact, is hardly articulate in reciting the nature and calculation of the amount of the Plaintiff's claim against the Debtor. The Complaint conclusively recites an "amount due" of $2,032.75, consisting of $1,964.04 in "Principal" and $68.74 in "Interest." The attachment of the mortgage reciting a total amount due of $2,286.00 and the Debtor's payments of $1,390.90 between 1981 and 1986, including $487.24 applied to the principal balance on the Plaintiff's own books, raises an immediate, unanswered question regarding calculation of the sums actually due. The Act 6 notice attached to the Complaint recites other, discrete figures regarding payments and "additional interest" due. See the discussion in the next paragraph *infra.* Review of the Complaint in light of the record presented at the hearing suggests to us that the Plaintiff's calculation of sums due to it may have resulted from unconscionable and possibly incorrect assumptions of its right to collect "interest." Further, it led us to suspect that, lurking beneath the inscrutable basis of the calculation of the figures on the Complaint, lay a potentially meritorious defense to the accuracy of the computations in the Complaint. The fact that the Debtor may well owe less than the Plaintiff demands is clearly a defense to its claim which we consider too significant to be passed upon by allowing the Plaintiff to retain a default judgment for the amount *it* claims is due.

The defect emphasized by the Debtor in the Act 6 notice arises from the recitation in the notice that the Plaintiff is in default because she failed to make "monthly payments of $38.10 for the months of 8/5/74 (partial) to 6/15/78 and including additional interest of $293.00," which is said, later in the notice without further explanation, to result in a total default of $1,993.00. The Plaintiff, asserting that this notice is insulated from attack due to its adherence to the "model form" prescribed by the Secretary of Banking, *see* 7 P.S. § 6020–166; 10 PA.CODE § 7.4; and *In re Mosley,* 85 B.R. 942, 954 (Bankr.E.D.Pa.1988), admits an er-

ror in that the letter *should* have recited "10/74" instead of "8/15/74 (partial)" as the initial date of default.

■ We note, as we did in *Mosley*, that a mortgagee's use of the model form as a means of compliance with 41 P.S. § 403(c) of Act 6 is only successful if the model form is filled out correctly. In *Mosley*, we pointed out that the most important consideration in the notice, for purposes of 41 P.S. § 403(c)(3), is whether the borrower can ascertain the precise amount due to the lender to cure the default at any given point in time by reference only to the notice. We should add that the important consideration in the notice, for purposes of 41 P.S. § 403(c)(2), is whether it communicates to the borrower how the precise amount of the default claimed is calculated.

If the only issue were whether the Debtor was misled by the recitations of "8/15/74 (partial)" instead of "10/74" as the starting point of the default, we might agree with the Plaintiff that this alleged defect is trivial. However, here, the information provided is much more fundamentally deficient. In reciting the dates of the Debtor's default, the notice makes reference to only the original mortgage between the since-departed IVB and the Plaintiff. However, it is actually the Debtor's arrangement with the Plaintiff, which was allegedly violated by the Debtor's failure to remit $40.00 monthly payments after December, 1986, which is the contemporary default which gave rise to this lawsuit. It is reference to *this* default and the performance necessary to cure *it* which we believe is far more relevant than an attempt to transpose information referencing loan payments due a decade before on the original obligation. Furthermore, it is totally unclear how the balance due was calculated in light of the Debtor's payments between 1981 and 1986. From where "additional interest of $293.20" springs is, to put it mildly, unclear, and the method of calculation of same approaches the realm of the mystical. Finally, given its record of doing so pursuant to same formula for over five years, we suspect that the Plaintiff, after dispatch of the March 19, 1987, no-

tice, may have continued to add interest which would have had to have been paid by the Debtor to effect a cure. However, no statement of same nor a basis for calculation of same is included in the notice.

We believe that the Plaintiff's failure to articulate the nature of the default of its arrangement with the Debtor and its failure to explain, by any comprehensible matter, how it calculated the default renders the notice in issue grossly violative of 41 P.S. § 403(c)(2) and (c)(3). Such gross violations of Act 6, in addition to raising a defense to the Complaint, may have deprived the state court of jurisdiction to hear the C.P. Case. *See Main Line Federal Savings & Loan Ass'n v. Joyce*, 632 F.Supp. 9, 10 (E.D.Pa.1986); and *Mosley*, *supra*, 85 B.R. at 951 n. 7.

Finally, the Debtor points to the Plaintiff's dispatch of the Act 91 notice on May 9, 1984, as insufficient compliance with that Act before commencement of foreclosure in October, 1987. The Debtor asks us to promulgate a rule that, whenever a mortgagee accepts payments after dispatch of an Act 91 notice, it must send out a new Act 91 notice before proceeding to foreclose. The Plaintiff, meanwhile, contends that Act 91 merely requires the dispatch of the notice at some time, no matter how remote, which is *prior to* commencement of foreclosure. 35 P.S. § 1680.402c(a). The applicable Regulations, moreover, require reiteration of notice only if the homeowner cures the delinquency or default and then becomes in default again. 16 PA. CODE § 40.203(10). Admittedly, the notice of May 9, 1984, was dispatched *prior* to October, 1987, and, also admittedly, the Debtor never cured the delinquency after May 9, 1984.

■ We decline the Debtor's request to lay down any hard and fast rule that acceptance of any payments after receipt of an Act 91 should trigger a requirement that a mortgage lender must repeat the dispatch of a notice to a homeowner before proceeding with foreclosure. However, we note that a mortgagee has the power to trigger new rights of the homeowner to apply for a homeowners emergency assist-

ance loan by simply dispatching a new letter at any time. The only restriction on multiple dispatches of letters and subsequent applications by mortgagors appears to be a prohibition of a mortgagor's reapplying for assistance within six months from a previous adverse determination, and even that time-restriction is not binding if "there is a material change in circumstances" of the mortgagor, 35 P.S. § 1680.404c(b). While dispatch of a new letter may result in delay to the mortgagee when the Act 91 notice is dispatched until the application process is complete, 35 P.S. § 1680.402c(b), the potential benefits of a successful application are as great to a mortgagee as to a mortgagor. Arrearages (in this case arguably the entire balance) of an obligation are cured in lieu of abiding doubtful receipt of payments from a financially troubled borrower.

■ We also note that Act 91 requires that any mortgagee who "desires to foreclose upon a mortgage," 35 P.S. § 1680.403c(a), must dispatch the notice of the right to apply for assistance. It seems sensible to require that there be some temporal relationship between the mortgagee formulating its desire to foreclose and the dispatch of the notice. A logical conclusion would be that an Act 91 notice should generally be sent at or about the time that the mortgagee expresses its desire to foreclose by sending an Act 6 notice. Indeed, the last paragraph of the May 9, 1984, letter states that an Act 6 notice has been sent at that time. *See Mosley, supra,* 85 B.R. at 952 (Debtor argues that sending two notices together may confuse mortgagor but this court rejects that argument). Therefore, we believe that the Plaintiff should have sent a new Act 91 notice at or about the time of dispatch of the Act 6 notice of March 19, 1987.

■ We believe that a rule of reason must control the issue of when a mortgagee is obliged to resend a notice to a mortgagor of the right to apply for benefits under Act 91 *and* that such a rule should be liberally construed to require a new notice wherever it appears practical to do so. Under the circumstances here, we believe that

the mortgagor should have been obliged to send a new notice some time in 1987 before proceeding with a foreclosure action.

We consider, first, the fact that the dispatch of an Act 91 notice on May 9, 1984, could hardly have been calculated to result in the response of applying for Act 91 benefits from the Debtor. At that point, she had been remitting $20.00 monthly payments, on a fairly regular basis, for almost three years. She had missed her April, 1984, payment, which may have triggered dispatch of the letter, but had made payments in the prior four months. She responded to the notice by making payments in May, 1984, and in each of the next four months. It therefore appears that her payment arrangement with the Plaintiff was not in a period of crisis in May, 1984, and she would have been unlikely to have contemplated a need to apply for Act 91's assistance at that point.

On the other hand, in the entire year 1987, for ten months prior to the Plaintiff's filing this lawsuit, the Debtor made no payments whatsoever. Her relationship with the Plaintiff, as was clearly apparent to both parties, had reached an unprecedented crisis. Logic dictates to us that, in these circumstances, the Plaintiff should have been obliged to send another notice of her rights under Act 91 to the Debtor before commencing a foreclosure action and that the Debtor's failure to respond to the previous letter, sent three years before at a time when no crisis was present, should not deprive the Debtor of an opportunity to invoke the benefits of Act 91 at this time of this crisis.

We therefore conclude that the Plaintiff's failure to dispatch a Act 91 notice during the year 1987, in these circumstances, also constituted a meritorious defense to the Complaint, and possibly deprived the state court of jurisdiction to enter the default judgment presently under attack.

■ Consideration of the contentions of the Debtor individually, and, particularly, making such considerations in the context of the general equities of this situation, demand that the default judgment entered against the Debtor in the C.P. Case be set

aside. The inadequacy of the Complaint served upon the Debtor and the dispatch of a defective Act 6 notice and an outdated Act 91 notice arguably render the judgment void, and subject to attack at any time. *See* Federal Rule of Civil Procedure (hereinafter "F.R.Civ.P.") 60(b)(4); *Gold Kist, Inc. v. Laurinburg Oil Co.*, 756 F.2d 14, 18–19 (3d Cir.1985); and 6 J. MOORE, FEDERAL PRACTICE, ¶ 55.10[2], at 55–68 (2d ed. 1988). In the alternative, applying the "considerations" articulated by the Third Circuit Court of Appeals for attacking potentially valid judgments, we find that the Debtor has meritorious defenses to this judgment and, given her poverty, illness, and lack of sophistication in legal matters, she can hardly be said to have acted culpably. *Compare Fleet v. United States Consumer Council, Inc.*, 70 B.R. 845, 849–51 (E.D.Pa.1987) (calculated, willful actions of defendant and counsel leading to default judgment result in denial of motion to open judgment). *But see In re Fleet*, 76 B.R. 1001, 1005–08 (Bankr.E.D. Pa.1987) (force of default entered even in the context of the prior decision reduced by holding that it only pertained to the named plaintiffs). It is likely that a liquidation of the Debtor's legitimate obligation to the Plaintiff will be effected in her Chapter 13 Plan. The only possible prejudice resulting to the Plaintiff from granting relief from the judgment to the Debtor, an inability to increase the sum due to it under the Plan due to the presence of an unconscionable judgment, is not the sort of adverse consequence to the plaintiff's interest envisioned as significant in considering whether to grant a motion for relief from a judgment. *Compare Emcasco, supra*, 834 F.2d at 74–75; and *Feliciano, supra*, 691 F.2d at 956–57.

We now briefly consider the practical aspects of our decision that the judgment against the Debtor must be vacated and the future of this adversary proceeding in light of this result. We agree with the Debtor's belief that the result attained is significant in advancing the rights of her and her other creditors, because it invalidates a state court judgment that we otherwise would be unlikely to be empowered to look behind. *See Heiser v. Woodruff*, 327 U.S. 726, 732–37, 66 S.Ct. 853, 855–58, 90 L.Ed. 970 (1946); and *Mosley*, 85 B.R. at 951 n. 7.

We further believe that this adversary proceeding has served its complete sense of usefulness in the bankruptcy process and should accordingly be closed. The Plaintiff should now be relegated, like the Debtor's other creditors, to invocation of the claims process as the exclusive means of asserting monetary claims against the Debtor. *See In re Clark, Williams, et al. v. Clark*, 91 B.R. 324, 337–38 (Bankr.E.D.Pa.1988). Of course, if the underlying bankruptcy case is dismissed, this court may vacate the Order entered herein and remand the proceeding to the state courts. *Cf.* 11 U.S.C. § 349(b).

An Order consistent with the conclusions reached by us in this Opinion will be entered.