**In re Gregory BRASBY and Katherine Brasby, Debtors.**

**Gregory BRASBY and Katherine Brasby, Plaintiffs,**

**v.**

**JOSEPH C. PERRY, INC., Joseph C. Perry, Thomas Turner, Esquire and Timothy Gorbey, Esquire, Defendants.**

**Bankruptcy No. 89–12147F.**
**Adv. Nos. 89–0561F, 89–0562F.**

United States Bankruptcy Court,
E.D. Pennsylvania.

Jan. 2, 1990.

Roger V. Ashodian, Delaware County Legal Assistance Ass'n, Chester, Pa., for debtors/plaintiffs, Gregory Brasby and Katherine Brasby.

Timothy J. Gorbey, Gorbey & Gorbey, Media, Pa., for defendants, Joseph C. Perry, Inc., Joseph C. Perry, Thomas Turner, and Timothy Gorbey.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

## OPINION

BRUCE I. FOX, Bankruptcy Judge:

In an ardent attempt to avoid the loss of their home, the debtors have brought a number of matters to this bankruptcy court for resolution. Prior to their filing a voluntary petition in bankruptcy on June 9, 1989, the debtors' home had been sold at a foreclosure sale by the second mortgagee, Joseph C. Perry, Inc. In this circuit, such a prebankruptcy sale would terminate a chapter 13 debtor's ability to cure any mortgage default. *Matter of Roach*, 824 F.2d 1370 (3d Cir.1987). *Accord In re Brown*, 75 B.R. 1009 (Bankr.E.D.Pa.1987); *In re Rouse*, 48 B.R. 236 (Bankr.E.D.Pa.1985). Thus, the debtors initiated an adversary proceeding seeking to set aside this foreclosure sale upon two related theories: that the sale constituted a fraudulent conveyance within the meaning of 11 U.S.C. § 548(a)(2), or alternatively, that the sale was a fraudulent conveyance under Pennsylvania law, 39 Pa.C.S.A. §§ 351 *et seq.*[1]

---

**1.** A state fraudulent conveyance statute is made applicable in bankruptcy proceedings by the "strong-arm" provisions of 11 U.S.C. § 544(b). *Accord In re Mankin*, 823 F.2d 1296 (9th Cir. 1987), *cert. denied*, 485 U.S. 1006, 108 S.Ct. 1468, 99 L.Ed.2d 698 (1988); *In re McDowell*, 87 B.R. 554 (Bankr.S.D.Ill.1988). *See generally McLean v. City of Philadelphia*, 891 F.2d 474 (3d Cir. 1989); *In re Kenval Marketing Corp.*, 69 B.R. 922 (Bankr.E.D.Pa.1987); 4 *Collier on Bankruptcy* ¶ 544.03 (15th ed. 1989). By virtue of 11 U.S.C. § 522(g), (h), a debtor may utilize these trustee's powers in certain circumstances. *See McLean.* Those circumstances are identical to those that allow the debtor to utilize the trustee's powers to set aside conveyances under

Although not quite as critical to the debtors' ability to utilize chapter 13, the debtors also challenge the underlying foreclosure judgment. *Cf. First Federal Sav. & Loan Assoc. v. Porter*, 408 Pa. 236, 183 A.2d 318 (1962) (issues connected with opening a judgment may be distinct from those involving the setting aside of an execution sale based upon that judgment). Since that judgment was entered in state court, the debtors filed a petition to strike or open the judgment in state court and then removed that litigation to bankruptcy court pursuant to Bankr.R. 9027. *See generally In re Pacor, Inc.*, 72 B.R. 927 (Bankr.E.D.Pa. 1987), *aff'd*, 86 B.R. 808 (E.D.Pa.1988). The defendants did not contest this removal by seeking remand.

There are other issues raised by the debtors which are not now before me. For instance, the debtors contend that defendant Turner, who represented them as counsel prepetition, committed malpractice.[2] The debtors also challenged, by way of a state court petition which again was removed to this court, the corporate defendant's attempt to gain possession of the real estate after the foreclosure sale. (That issue has been now resolved by a stipulation between the parties.)[3] Therefore, I shall only focus upon the debtors'

challenge to the foreclosure sale and the underlying judgment.

## I.

## A.

I make the following factual findings.

1. On March 11, 1983, the debtors, Gregory and Katherine Brasby, purchased the real property located at 742 Fern Street, Yeadon, Pennsylvania. The purchase price of $39,000.00 was financed in part by a $26,000.00 mortgage loan provided by Society Hill Savings and Loan Association. The mortgage loan had a 20 year repayment period; requisite monthly payments included escrows for taxes.

2. In August 1983, the debtors ceased making full monthly mortgage payments to Society Hill. After some delay (the debtors requested of Society Hill various opportunities to bring their mortgage current, none of which bore fruit) the mortgagee commenced foreclosure proceedings in state court, Delaware County.

3. The mortgagee obtained judgment in foreclosure, and the debtors' residence was listed for foreclosure sale to be held on February 26, 1986. Both the foreclosure suit and execution sale were noticed to the public.

§ 548. Furthermore, the standard to set aside a sheriff sale under Pennsylvania law, pursuant to § 544, due to the price paid at the sale, is more difficult than the standard fixed to set aside a sale under § 548 (as will be discussed *infra*). *Cf. Capozzi v. Antonoplos*, 414 Pa. 565, 201 A.2d 420 (1964) (applying the state fraudulent conveyance statute, petitioner must demonstrate that the foreclosure price was "grossly inadequate"); *Continental Bank v. Frank*, 343 Pa.Super. 477, 495 A.2d 565 (1985) (same). If one assumes the applicability of § 548 to duly conducted foreclosure sales, there is no conveyance which would be fraudulent due to inadequacy of price under Pennsylvania law during a one year reach back period which would not also be fraudulent under § 548. (The latter statute has a one year reach back period, while Pennsylvania law has a longer reach back period. *See generally In re Frascatore*, 98 B.R. 710 (Bankr.E. D.Pa.1989).) Since the challenged foreclosure sale occurred within one year of the debtors' bankruptcy filing and commencement of their adversary proceeding, and since the only "fraud" claimed by the debtors is that the price paid was too low, there is no reason for me to

reach this state law issue. If the challenged transfer did not violate the provisions of § 548(a)(2), it also would not violate Pennsylvania law, given the latter's more stringent standard.

2. Whether this malpractice assertion can be tried in this bankruptcy court I need not now decide. One issue, of which plaintiffs may not be aware, is Mr. Turner's penchant for filing voluntary petitions in bankruptcy in this district. Currently, he personally has a chapter 13 case pending before my colleague, Judge Scholl, at Bankr. No. 89–13336S. The provisions of 11 U.S.C. § 362(a) therefore may act as a stay of any malpractice suit.

3. Although Mr. Perry individually and Mr. Gorbey, the attorney for the corporate defendant, have been named as defendants in the adversary proceeding to set aside the foreclosure sale, I do not understand the debtors to be seeking any relief from these individuals. The debtors may have sought relief from them in connection with the ejectment dispute but that has been resolved.

4. Attorney Thomas Turner, either personally or through employees, became aware of the pending mortgage foreclosure action against the debtors' realty by virtue of the published notices, and offered to represent the debtors. They accepted and retained this attorney.

5. On October 21, 1985 (prior to the scheduled foreclosure sale) there was a fire at the debtors' home. The debtors sought the services of an insurance adjuster, and through that adjuster met with defendant Joseph C. Perry, Inc. ("Perry"), a home repair contractor.

6. The insurance contract was not offered in evidence; it was uncontroverted, though, that fire insurance coverage existed on the realty and its contents under a policy issued by The Philadelphia Contributionship. The parties agreed that the debtors hired Perry to repair the fire damage. This agreement was not reduced to writing.[4] The parties also agreed that the work done by Perry would be paid by insurance proceeds upon approval of the insurer.

7. Perry began the restoration work and believed that it had fully completed the job by December, 1985. The insurer decided that some of the work done was not connected to the October 1985 fire and refused to approve payment for such work. The debtors believed that not all work agreed upon was completed and that some work was done improperly.[5]

8. The insurer offered to pay $25,487.00 for the restoration work done by Perry and Perry accepted this offer, even though it had submitted a bill in excess of $30,000.00. The debtors remained unsatisfied and refused to acknowledge that Perry had fully performed.

9. The insurer decided to withhold payment for the insured contents and other portions of the insurance proceeds until the dispute between the debtors and Perry was resolved.

10. In early December 1985, the debtors signed an undated certificate of satisfaction stating that Perry had fully performed the requisite restoration work and directing that it be paid by the insurer.

11. As a result, the insurer paid the debtors for loss of contents and living expenses caused by the fire in the total amount of $12,392.30.

12. On December 10, 1985, Mr. Brasby stated to the insurer that he was dissatisfied with the work done by Perry and requested that the insurer make payment of the insurance proceeds to the debtors alone. The insurer refused.

13. The failure of Perry and the debtors to resolve their differences was one impediment to Perry being paid from the insurance proceeds. Another impediment, unknown to Perry at the time it commenced work on the debtors' home, was that the insurer insisted that the mortgagee, Society Hill, also be a payee on the proceeds check. Having attained its judgment in mortgage foreclosure, Society Hill was unwilling to endorse the proceeds check to the use of the debtor, Perry or both.

14. In late January 1986, the insurer stopped payment on certain proceeds checks due to the failure of the various payees to reach an understanding as to distribution, and threatened to commence an interpleader action.

15. Negotiations then ensued between counsel for the debtors, for Society Hill, and for Perry which resulted in a settlement. In order to allow this settlement to be effectuated, Society Hill postponed its scheduled February 1986 foreclosure sale.

16. On March 12, 1986, all parties participated in a closing at the offices of a title insurance company. The fire insurer paid $25,487.00, of which $14,612.74 was remit-

---

4. In their proposed findings of fact at No. 11, defendants refer to Ex. D–28 as a memorandum confirming the agreement between the debtors and Perry. This exhibit, which was introduced in evidence without its attachment, states merely that it is an "informal document of our [Perry's] conceptions."

5. Obviously, part of the disagreement between the debtors and Perry might not have occurred had the two parties and the insurer expressly agreed in advance to the work that was required under the insurance policy.

ted to Society Hill. Perry received $9,987.00 and was also granted a second mortgage on the debtors' realty in the amount of $15,500.00.[6]

17. The payment to Society Hill was intended to reinstate the mortgage and cure any delinquencies, including escrows and attorney's fees. Upon receipt of this payment, Society Hill cancelled the foreclosure sale and reinstated the mortgage.

18. The settlement did not expressly resolve the dispute between the debtors and Perry regarding the restoration work. At the closing, the debtors requested that Perry perform certain additional work. Perry refused. Perry did agree to reinspect the work done (and did so inspect). However, the Perry mortgage agreement itself, negotiated by counsel to the parties, contained no provision conditioning payment upon further work.

19. The debtors' contention that Perry agreed at settlement to perform further work is belied by the necessity for an inspection as well as by the testimony of the debtors' counsel, Mr. Turner, and Perry's counsel, Mr. Gorbey.

20. Turner acknowledged that, at the closing, Perry (through counsel) refused to agree to perform any additional work, and certainly never agreed to condition payment on its second mortgage upon completion of such additional work.

21. More significantly, Turner testified (without objection) that it was his intention to leave unanswered the question of additional performance by Perry. The debtors' attorney reasoned that the debtors had no financial resources to pay Perry (or for that matter Society Hill) on the mortgage created by the settlement. Nonetheless, he recommended to the debtors that they proceed with the settlement as a way of avoiding Society Hill's pending foreclosure sale.

22. As Turner testified, he did not want to resolve with Perry the dispute surrounding the restoration work, for at that point the debtors would have no potential de-

fense to Perry's claim on the second mortgage. Therefore, at the closing, he neither insisted that the mortgage and note given to Perry require as a precondition that additional work be done, nor did he attempt, after settlement and the inspection, to reach some agreement with Perry's counsel on this point.

23. On May 30, 1986, counsel for Perry wrote to counsel for the debtors and offered to perform some additional repair work (which was less than the debtors sought at the March 1986 settlement) if the debtors would agree in writing that this list, when completed, would fully satisfy any complaints which the debtors had. Counsel for the debtors never responded to this offer; neither he nor the debtors ever made demand upon Perry to finish any additional restoration work.

24. The mortgage and note obligated the debtors to pay $221.49 per month to Perry for 20 years. No payments were ever made upon this note, and Society Hill received but $600.00 in total payments after the March 1986 settlement. Perry never did any additional work on the debtors' realty after the settlement.

25. After demand was made upon the debtors for payment, including notices sent as required by state law, Act 6 of 1974, 41 P.S. § 403, and Act 91 of 1983, 35 P.S. § 1680.403c, Perry commenced a foreclosure suit in Delaware County, Court of Common Pleas, No. 86–16805, on November 12, 1986.

26. The debtors retained Turner to defend the foreclosure action and an answer was filed alleging, as the sole defense, that no payments were due Perry because of its failure to complete the restoration work.

27. In April 1987, Perry filed discovery requests against the debtors and later sought to depose them. When no response to the discovery requests was received, and when the debtors and their counsel failed to appear at the noticed deposition, Perry filed, on September 27, 1987, a motion in

---

**6.** The balance of the insurance proceeds went to pay certain fees to the title company and to the debtors' attorney, Mr. Turner.

state court to compel discovery. The motion was never answered by the debtors.

28. On March 31, 1988, Judge Surrick of the Court of Common Pleas of Delaware County granted the motion to compel and ordered the debtors to appear at a deposition scheduled for April 26, 1988. (Ex. D-47.) The order further directed that Perry serve a copy of the order upon the debtors as well as their counsel, by certified mail and regular mail. In addition, the order clearly stated that if the debtors failed to appear at the deposition, judgment in foreclosure would be entered against them in the amount requested in the complaint—$19,803.21.

29. Perry served this order as directed, upon both the debtors and their counsel, and received no response. Notice of the order was also sent by the court prothonotary under Pa.R.C.P. 236. Nevertheless, neither the debtors nor their counsel appeared at the scheduled deposition.

30. The certified notices to the debtors went unclaimed as the debtors had decided not to receive any certified letters due to their distressed financial circumstances. Regular mail notices sent to the debtors were never returned to the sender.

31. While Mrs. Brasby separated from her husband in September 1987 and vacated the premises, she still viewed the Fern Street residence as her mailing address and continued to pick up her mail at that location. No new address had been provided to debtors' counsel, the state court or Perry; nor had any forwarding address been recorded with postal authorities.

32. On November 3, 1987, debtors' counsel, Mr. Turner, sent the debtors a letter which stated, in part, that he had not heard from them in some time and would cease to represent them if they did not communicate with him within ten days of that letter. (Ex. D-31.) When they failed

to respond, Turner simply closed their file. He testified that it was not his practice to file motions to withdraw as counsel in civil matters as it took too much time.

33. Turner ceased representing the debtors and never responded to the court order compelling attendance at a deposition. He did alert counsel for Perry that he had lost communication with the debtors and would not appear as scheduled.

34. In May 1988 counsel for Perry alerted the state court to the debtors' failure to comply with the order compelling attendance at a deposition. The court per Judge Surrick then entered judgment on July 22, 1988 in favor of Perry in the amount mentioned above. Notice of this order was sent pursuant to Pa.R.C.P. 236 and no appeal was taken.

35. On September 23, 1988, Perry began to execute on its judgment. A writ of execution was issued and served upon the debtors by certified mail, which went unclaimed, and by posting the property. Notice of the proposed sale was also placed in the Delaware County Legal Journal and in the Yeadon local newspaper.

36. On December 9, 1988, the state court (per Judge Wright) entered an order determining that sufficient notice of the sale had been given. It appears that this order may have been entered upon Perry's *ex parte* motion.

37. On December 12, 1988, Perry hired a process server to personally serve the order and notice of the forthcoming foreclosure sale upon the debtors. The process server filed an affidavit stating that service was made on December 12, 1988 upon one Michael Wiggins.

38. The process server credibly testified at trial that the individual who identified himself as Michael Wiggins was in fact the debtor, Gregory Brasby.[7] Thus, Mr. Bras-

---

7. Michael Wiggins was identified as Mr. Brasby's brother-in-law and an individual who was residing in the debtors' home with Mr. Brasby after Mrs. Brasby vacated the premises. I find unconvincing Mr. Brasby's testimony that Mr. Wiggins was served with the documents, and never mentioned them to him until, unprompted, Wiggins raised the matter many months

later. As a resident of long standing in the property, there was no reason for Wiggins to ignore a notice of an imminent foreclosure sale and then bring attention to his actions months later.

In addition, even if service had been made upon Wiggins, such service may be valid under

by was personally served with prior notice of the sheriff sale.

39. On December 16, 1988, the debtors' residence was sold to Perry at foreclosure sale. Perry bid only $1.00 and then paid $1,027.37 in costs. The deed was not acknowledged by the Sheriff of Delaware County until April 5, 1989 and was not recorded by Perry until April 10, 1989.

40. Immediately after the sheriff sale, the debtors were insolvent in that their assets (personalty) had an approximate value of $4,000.00 while their obligations exceeded $16,000.00.

41. In November 1988, a minor kitchen fire occurred and in January 1989 a more serious fire occurred in the realty.

42. As of the date of the sheriff sale, December 16, 1988, the value of the debtors' realty was approximately $75,000.00. (As I noted at trial, I viewed defendants as having decided, prior to trial, to accept the debtors' expert appraisal on the issue of valuation.) I reach this conclusion: by considering the debtors' valuation report (Ex. P–1), which valued the property as of July, 1989; by discounting somewhat the value suggested by the appraisal because of the condition mentioned and the sale price reported for the nearest comparable home to the debtors (comparable # 10); and, by increasing the value stated in the appraisal because some of the condition problems referred to in July were caused by a fire in January, 1989 (after the foreclosure sale) and only part of the damage done had been rectified as of the appraisal date, July 1989.

43. Perry, in purchasing the property at foreclosure sale, had its lien extinguished; in addition, it took subject to the lien of Society Hill, as well as unpaid municipal tax liens, which are made priority liens under state law. 53 P.S. § 7106(a). *See generally In re McLean,* 97 B.R. 789 (Bankr.E.D.Pa.1989). The first lien of Society Hill, as of that date, was approximately $44,600.00. As of September 1989, the Borough of Yeadon claimed to Perry that 1987 and 1988 real estate taxes remained unpaid in an amount of approximately $3,770.00. (Ex. D–44.)

44. The debtors filed a voluntary petition in bankruptcy under chapter 13 on June 9, 1989. Prior to commencing a bankruptcy case, they filed a petition to set aside the foreclosure judgment and an equity action to enjoin Perry from ejecting them from the premises.

45. In addition to that detailed above, much has transpired between these parties since the sheriff sale of the debtors' residence to Perry. For example, there was a fire in January, 1989. Perry claims and the debtors deny that they abandoned the premises. Perry has made certain partial payments to Society Hill on its mortgage lien.

### B.

I reach the following legal conclusions.

1. Defendant Perry provided reasonably equivalent value when it purchased 742 Fern Street in Yeadon, Pennsylvania, at foreclosure sale on December 16, 1988. Therefore, assuming that the bankruptcy fraudulent conveyance statute, 11 U.S.C. § 548(a)(2), applies to foreclosure sales, there is no statutory basis to set aside this sale.

2. The debtors have not met their burden to establish that the foreclosure judgment entered against them on July 22, 1988 should be opened or stricken.

3. The debtors have not met their burden of demonstrating that the sheriff sale should be set aside because the procedures and notice given were defective.

### II.

I turn first to the issue of avoidance of the foreclosure sale. As the parties fairly note, there is a dispute whether the provisions of 11 U.S.C. § 548(a)(2) may be applied to a properly conducted foreclosure sale held pursuant to state law. *See Butler v. Lomas & Nettleton Co.,* 862 F.2d 1015 (3d Cir.1988); *In re Madrid,* 725 F.2d 1197 (9th Cir.), *cert. denied,* 469 U.S. 833, 105 S.Ct. 125, 83 L.Ed.2d 66 (1984); *In re*

Pennsylvania rules because it was upon an adult resident of the premises. Pa.R.C.P. 402(a)(2)(i).

*Robinson,* 80 B.R. 455 (Bankr.N.D.Ill. 1987). *See also* DeReamer, *Upsetting the Law of Transfer: Mortgage Foreclosures as Fraudulent Conveyances Under the Bankruptcy Code,* 63 Am.Bankr.L.J. 321 (Summer, 1989); 10 *Norton Bankruptcy Law Advisor* 1 (October, 1989). While the majority of courts, based upon the plain language of the bankruptcy statute, particularly 11 U.S.C. § 101(50) (as amended), have concluded that § 548(a)(2) does indeed apply to foreclosure sales, *see In re Littleton,* 888 F.2d 90 (11th Cir.1989); *In re Corbett,* 80 B.R. 32 (Bankr.E.D.Pa.1987); *In re Robinson; In re New Yorketown Associates,* 40 B.R. 701 (Bankr.E.D.Pa. 1984), this issue was expressly left unresolved by the Third Circuit. *Butler v. Lomas & Nettleton Co.,* 862 F.2d at 1015–16.

Obviously, the debtors contend that this critical issue should be resolved in their favor while the defendants take the opposite position. Along with the Court of Appeals, I need not decide the question in order to resolve the instant dispute. I shall assume that a foreclosure sale can be set aside in bankruptcy if the sale was for less than "reasonably equivalent value." Here, however, reasonably equivalent value was received; thus, the sale cannot be rescinded.

In *Butler,* the Court of Appeals noted as follows:

> Section 548 empowers the trustee to avoid conveyances made with fraudulent intent, i.e., actually fraudulent (§ 548(a)(1)) as well as constructively fraudulent conveyances (§ 548(a)(2)). A conveyance is constructively fraudulent if: 1) the debtor was insolvent on the date of the transfer [or became insolvent as a result of the transfer] (§ 548(a)(2)); 2) the debtor received less than "a reasonably equivalent value" in exchange for the transfer § 548(a)(2)(A)); and 3) the transfer is made within one year prior to filing the bankruptcy petition (§ 548(a)).

862 F.2d at 1017. *Accord, e.g., In re Metro Shippers, Inc.,* 78 B.R. 747 (Bankr.E.D.Pa. 1987).

The evidence was clear that either just before or just after the challenged sheriff sale, the debtors were insolvent, as their debts exceeded their assets. 11 U.S.C. § 101(31). It is also undisputed that the sale occurred on December 16, 1988, well within one year of the debtors' bankruptcy filing. *Butler.* Therefore, the only issue is whether the sale produced reasonably equivalent value for the estate.[8]

To meet their burden of demonstrating lack of reasonably equivalent value, the debtors have labored tirelessly in their attempts to analyze the record so as to maximize the value of the realty and minimize the value received at the foreclosure sale. Their arguments regarding the value received, though, demonstrate a slight loss of focus as to the purpose of § 548(a)—which is to recover for the estate assets that could be distributed to unsecured creditors (or to equity security holders, or to the debtor as exempt property). *In re Littleton. See also In re Lindsay,* 98 B.R. 983, 989 (Bankr.S.D.Cal.1989); *In re New Yorketown Associates,* 40 B.R. at 705 (§ 548(a)(2) is designed to rectify the prepetition depletion of the debtor's estate). As a result, the true issue is not whether the transferee has or will obtain a large return on his purchase price, but whether the estate has suffered a significant loss.[9]

---

8. Technically, for a debtor to utilize the provisions of § 548(a)(2), the debtor must also demonstrate that the transfer was involuntary, the trustee does not attempt to avoid the transfer, and the debtor did not conceal the property. 11 U.S.C. § 522(g), (h). There is no dispute that these preconditions have also been proven.

9. For example, assume that property worth $100,000.00 has three liens upon it. Those liens are a first lien of $90,000.00, a second lien of $7,000,000. and a third lien of $1,000.00. The third lienholder is not paid by the debtor prepetition and so schedules a foreclosure sale. At the sale, this lienholder bids $1.00 for the property and prevails, because any successful bidder would purchase subject to the two prior mortgages. (Furthermore, the bid of the third mortgagee includes the value of his foreclosure judgment; thus, any outsider bidder must bid at least $1,002.00 to prevail.)

On one hand, it can fairly be said that the successful bidder has paid $1,001.00 to acquire an interest in property which, if sold at fair market value without transaction costs, will re-

■ As noted above, I have concluded, based in part upon an appraisal report offered into evidence by the debtor, with adjustments to reflect that the appraised value had been somewhat overstated in the report and that it valued the property six months after the foreclosure sale (with certain damage and partial repair occurring in that interval), that the fair market value of the property at the time of sale was $75,000.00. At the time of the sale, their were two liens on the premises.[10] The first was a mortgage lien held by Society Hill Savings and Loan Association; the second was a judgment lien held by Joseph C. Perry, Inc. Prior to entry of its judgment, Perry held a second mortgage lien. (The mortgage lien merged into the judgment lien. *See In re Rorie,* 98 B.R. 215 (Bankr.E.D.Pa.1989)). Perry was the successful bidder at the sale and paid the Sheriff $1,028.37 in cash, including costs. In addition, by virtue of state law, a buyer at a foreclosure sale initiated by the second mortgagee takes free of the second (and

any subsequent) lien but subject to a first mortgage lien. *See* 42 Pa.C.S.A. § 8152(a). The buyer also takes subject to unpaid municipal liens. *See* 53 P.S. § 7106(a). Thus, Perry purchased the debtors' residence subject to the lien of Society Hill (and unpaid tax liens) and with the extinguishment of his own lien. *See* 11 U.S.C. § 548(d)(2)(A); *In re Brunell,* 47 B.R. 830 (Bankr.E.D.Pa.1985).

■ Perry's judgment was in the amount of $19,803.21. Thus, the "value" that Perry gave for the purchase of the debtors' realty, as defined by 11 U.S.C. § 548(d)(2), was the sum of the cash paid over to the Sheriff, $1,028.37, the satisfaction of Perry's judgment lien of $19,803.21, plus to the lien amount held by Society Hill and the unpaid tax liens. *See, e.g., In re Littleton; In re Brunell; In re McClintock,* 75 B.R. 612 (Bankr.W.D.Mo.1987). *But see In re Cole,* 81 B.R. 326 (Bankr.E.D.Pa.1988).[11]

turn him $3,000.00—for a rate of return of approximately 200%. On the other hand, the estate had only a 2% equity interest which was lost by this transfer. In the context of § 548, it is usually the percentage of equity lost in relation to the value of the property that is most meaningful, not the rate of return to the buyer. *In re Littleton.*

Phrased differently, if the trustee sold realty with an appraised value of $100,000.00 for only $97,001.00 (with all proceeds thus going to secured creditors), such a price would be presumptively "fair value." *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 149 (3d Cir. 1986).

10. In addition, there is no dispute that taxes on the property were unpaid at the time of sale, which also constituted municipal liens.

11. The court, in *Cole,* rejected the notion that the bid price of a judgment creditor should be added to its judgment lien to determine value. To the extent this bid price does not represent cash payable to the sheriff in addition to the satisfaction of the judgment lien, I agree with *Cole.* However, to the extent it does represent additional cash, such as here, where Perry paid $1,028.37 to the Sheriff, I disagree. Such additional payments represent part of the price paid for the property.

I appreciate that in *Ananko v. Harsanyi,* 91 B.R. 231 (D.N.J.1988), the court discounted sums paid to the sheriff for costs as part of "reasonably equivalent value" by reasoning that

such sums were not received by the debtor. Such an analysis wrongfully equates the benefit received by the debtor with the benefit received by the estate. Where sheriff's costs are not greater than normal transaction costs associated with sale of real estate (i.e. broker's commission), it is difficult not to include such costs as part of the value paid. Generally, appraised value of residential real estate will be exclusive of transaction costs and so does not represent the sum which the estate would receive upon sale. When, as here, such an appraisal is used, it is appropriate to consider transaction costs, including those paid to the sheriff, as part of the value received, unless measurably greater than predicable market costs. For example, a normal 6% real estate commission on the sale of a $75,000.00 home, which is paid by the seller by deduction from the proceeds of sale, is much greater than the costs paid by Perry to the sheriff. I therefore conclude that such foreclosure costs should be included in the determination of value paid.

I also disagree with the suggestion in *Cole* that the equity of the property—that is, the fair market value in excess of liens—should in some measure always be considered independent from the value of the property itself, in determining "reasonably equivalent value." The absolute dollar value of the equity is not generally relevant. *See also In re Garrison,* 48 B.R. 837, 840 (D.Colo.1985). This dispute does not represent the issue of whether the pre-foreclosure equity, because of its significant size in absolute dollars, should be considered.

The parties spent much energy debating the size of Society Hill's lien as of December 16, 1988. Fixing the payoff figure of this first mortgage, usually not a difficult issue, is made complicated by two factors. First, Society Hill altered its method of determining the balance due on the mortgage loan during the course of this loan. In April 1986, shortly after it reached a settlement with the debtors by receiving some insurance proceeds and after it reinstated their mortgage loan as current, Society Hill decided that it would capitalize unpaid but earned interest—*viz.*, charge interest on interest—and did so prospectively. The debtors argue that such a change was improper. Second, the debtors assert that they overpaid Society Hill in March 1986 when they reached a settlement to reinstate the mortgage by utilizing these insurance proceeds; therefore, the debtors compute the payoff due to Society Hill in December 1988 (when the foreclosure sale occurred) by crediting this purported overpayment to principal as of April 1986 and then calculating the amount due in December 1988 based upon this lower principal figure without capitalization of unpaid interest.

After the foreclosure sale occurred, Society Hill informed Perry that its payoff figure as of December 31, 1988 was $47,373.64. If one were to subtract the interest charged on interest, the payoff figure would be $44,625.85. The debtors contend that the correct payoff figure due to their alleged March 1986 overpayment was $37,898.90.

Were I forced to decide the precise payoff figure for Society Hill (which is not a party to this dispute), I would conclude that the $44,625.85 is most likely correct. I see no basis in the mortgage or state law for the capitalization of interest and so the higher figure seems incorrect. *See Appeal of Capps*, 836 F.2d 773 (3d Cir.1987). The trouble with the debtors' lower figure is that the March 1986 settlement payment to Society Hill, which was designed to bring the mortgage current, was negotiated by counsel for all parties. To the extent, as the debtors argue, they overpaid attorney's fees, such overpayment might be viewed as negotiated consideration for the mortgagee's postponement of a scheduled sheriff sale so as to allow the debtors the opportunity to later receive the insurance proceeds which were designed to cure the delinquency. Similarly, Society Hill could not argue after the settlement that the mortgage delinquency was not cured by the settlement and that it was free to proceed to foreclose.[12]

On the record before me, I see no need to determine precisely the payoff figure for Society Hill's lien, or to decide whether the debtors, in June 1989, could alter the settlement they reached, through counsel, in March 1986. I shall assume the debtors' lower figure is accurate. I nonetheless differ with the debtors, though, as to their application of § 548(a)(2).

■ Essentially, they argue that the failure of Society Hill's lien to be satisfied upon sale, even though the buyer takes subject to the lien, does not represent additional compensation paid for the property. Rather, they suggest that the fair market value of the property should be reduced by the amount of the unsatisfied lien, *see In re Jacobson*, 48 B.R. 497 (Bankr.D.Minn. 1985), and the consideration paid by Perry be examined in relation to this lower value.[13] Such an approach is counterintuitive.

---

12. The debtors also make the assumption that a purchaser at sheriff sale, such as Perry, could raise any potential overpayment made by the prior mortgagor when it purchases the property subject to the prior lien. I need not address the correctness of that assumption.

13. An example will illustrate the debtors' position. Assume that the appraised value of the realty were $100,000.00 and the first mortgage lien was in the amount of $60,000.00 and the second lien was for $20,000.00. If the property were sold at foreclosure to the second lienholder for $1,000.00 plus the satisfaction of the second lien, and subject to the first lien, the debtors contend that the buyer lienholder gave $21,000.00 in value (satisfied lien plus cash) to obtain a $40,000 interest (market value less first lien). By that reasoning, the transfer value was only 52% of what was received. Of course, if there is no deduction of the first lien amount from the property value, and if the first lien is added to the consideration paid, the buyer has paid 81% of the value of the realty.

Assumption of secured debt is generally viewed as a component of the purchase price in a non-bankruptcy context.[14] *See In re Carter,* 4 B.R. 692, 694 (Bankr.D. Colo.1980). Unless the buyer pays this lien, either by a lump sum payment or payments over time, he will suffer foreclosure of his property. Therefore, I conclude that the consideration given by Perry at the foreclosure sale includes the value of the assumed senior lien. *Accord In re Littleton; In re IPI Liberty Village Associates,* 82 B.R. 507, 509 (W.D.Mo.1987); *In re McClintock.* Adding together this senior lien (utilizing the debtors' asserted lower amount), the satisfaction of Perry's second lien, *In re Brunell,* and the cash paid at sale, I conclude that the consideration paid was in the approximate amount of $58,728.00. In addition, there clearly were unpaid tax liens in December 1988 which remained attached to the subject premises. While I do not know their precise amount, a conservative estimate (given the Borough of Yeadon's September 1989 demand) would be $2,200.00. Therefore, Perry obtained a transfer in December 1988 of realty worth approximately $75,000.00, for payments of approximately $61,000.00. This consideration represents roughly 81% of value.[15]

Not only is the question of the applicability of § 548(a)(2) to foreclosure sales in dispute among courts, but also in dispute is the methodology by which one concludes that reasonably equivalent value either was or was not provided. The majority approach follows *Durrett v. Washington Nat. Ins. Co.,* 621 F.2d 201 (5th Cir.1980). *Durrett* has been interpreted as requiring that the foreclosure price paid equal at least 70% of fair market value. *Accord, e.g., In re Thrifty Dutchman, Inc.,* 97 B.R. 101 (Bankr.S.D.Fla.1988); *In re Jones,* 20 B.R. 988 (Bankr.E.D.Pa.1982). Other courts eschew any rigid requirement and

suggest that all facts and circumstances be considered. *See In re Littleton; In re Bundles,* 856 F.2d 815 (7th Cir.1988). A third approach, epitomized by decisions such as *In re General Industries, Inc.,* 79 B.R. 124 (Bankr.D.Mass.1987), emphasizes the "commercial reasonableness" of the sale rather than the percentage of value received.[16] Recently, somewhat of a hybrid fourth approach was suggested in *In re Lindsay,* 98 B.R. at 991. That court would determine whether reasonably equivalent value was proved by a sequential determination: whether the foreclosure was properly conducted; whether commercially reasonable steps to obtain the best price were undertaken; and, if the answer is negative to either of the two prior steps, whether the price obtained bears some fair relationship to value. Finally, as mentioned above, my colleague, Judge Scholl, has asserted a fifth approach in *In re Cole,* 81 B.R. at 330. By this last approach, there would be a determination that reasonably equivalent value was not provided via foreclosure sale if the liens removed or assumed by the sale were not 70% of fair market value and if the price bid was not 70% of the debtor's equity in the property.

■ Given the purpose behind section 548(a)(2), it is preferable to favor an approach to defining reasonably equivalent value that recognizes the primacy of the percentage of value lost by the estate, especially in the context of judicial foreclosure sales of residences. While I appreciate the general difficulties in the valuation process, *see In re Mikole Developers, Inc.,* 14 B.R. 524, 526 (Bankr.E.D.Pa.1981), as well as its potential interrelationship with marketing efforts, these concerns are unlikely to be relevant when analyzing prepetition sheriff's sales of non-commercial real estate. Valuation of such property, within a relatively narrow range, is not

---

**14.** Indeed, if the assumed lien has a below market interest rate, the benefit of assuming such rate could be a factor in calculating the true overall price paid. The mortgage held by Society Hill bears an interest rate of 16.5%. Its assumption by Perry cannot be viewed as currently below market.

**15.** Were I to utilize a pay off figure for Society Hill of $44,625.85, the percentage consideration to fair market value rises to roughly 90%.

**16.** The court, though, later notes that the price obtained along with sales effort are both factors to be considered. 79 B.R. at 133.

that difficult (utilizing the comparative market approach). Furthermore, such foreclosure sales will rarely be advertised in a manner designed to attract the highest possible bid, and so will rarely be conducted in a commercially reasonable manner. *See In re Lindsay; In re General Industries, Inc.* The notice provisions of foreclosure sales are primarily designed to meet due process interests of owners and lien creditors and not to maximize the sale price.

Therefore, the price achieved in relation to value should serve as the principal consideration under § 548(a)(2) when examining the fairness to the estate of such foreclosure sales.

Whether the benchmark should be 70% or some flexible ratio, *compare In re Littleton* (flexible) *with In re Cole* (firm) need not now be decided. Here, conservatively, the amount paid by Perry to obtain title to the property was 81% of its value, well in excess of any 70% threshold. This high a percentage has been viewed as "reasonably equivalent" for purposes of § 548(a). *In re Thompson,* 18 B.R. 67 (Bankr.E.D.Tenn. 1982). Furthermore, in *In re Abbotts Dairies of Pennsylvania, Inc.,* 788 F.2d 143, 149 (3d Cir.1986), the Third Circuit concluded that "fair value" is given for property in a bankruptcy sale under section 363 when at least 75% of the appraised price is paid. *Accord Willemain v. Kivitz,* 764 F.2d 1019 (4th Cir.1985); *Seychelles, Partnership & Genius Corp. v. Banyan Corp.,* 32 B.R. 708 (N.D.Tex.1983). There is no reason to conclude that "reasonably equivalent value" is a higher standard than "fair value," especially given their similar purposes.[17]

In sum, assuming the applicability of § 548(a)(2) to foreclosure sales in general, the bankruptcy estate here did lose some equity by virtue of the prepetition foreclosure sale. This loss, given its relationship to the value of the property, was not sufficient to warrant setting aside the sale.

**17.** The purpose of a bankruptcy sale is to achieve the highest value for the estate. *See In re Snyder,* 74 B.R. 872, 876 (Bankr.E.D.Pa.1987).

### III.

The debtors' principal challenge to the foreclosure sale was based upon § 548, which was just addressed. They additionally contend, though, that the foreclosure sale (and therefore the above analysis by which it was determined not to be a fraudulent conveyance) is based upon the existence of a valid judgment lien (or prior mortgage) held by the corporate defendant, Perry. By way of a motion to open or strike the judgment, the debtors assert that this underlying judgment was improperly entered and should be set aside. I shall discuss these concerns in a relatively brief fashion.

### A.

■ As was noted in *In re Miller,* 90 B.R. 762 (Bankr.E.D.Pa.1988) (and cases cited), removal of the debtors' state court petition to open or strike the judgment to this federal bankruptcy court requires the application of federal principles and procedures. The underlying action is now treated as if it had always been in federal court. *Id.*

■ To the extent the debtors are now seeking relief under Bankr.R. 9023 and 9024 (which essentially incorporate Fed.R. Civ.P. 59 and 60), the appropriate standard to apply has been established in this circuit. A court must consider whether the plaintiff would be prejudiced if the judgment were set aside, whether the defendant has a meritorious defense on the merits, and whether the culpable conduct of the defendant led to the entry of the judgment. *See Gross v. Stereo Component Systems, Inc.,* 700 F.2d 120, 122 (3d Cir.1983); *Feliciano v. Reliant Tooling Co.,* 691 F.2d 653, 656 (3d Cir.1982); *In re Miller,* 90 B.R. at 766; *In re Earle Industries, Inc.,* 67 B.R. 822, 824 (Bankr.E.D.Pa.1986). Under all three factors, the debtors here experience difficulty.[18]

**18.** Since Perry was the purchaser of the property and it is a party to this action to open or strike the judgment, I need not decide whether opening a judgment after sheriff sale could di-

Since the entry of the judgment, Perry has expended funds to the sheriff of Delaware County for the foreclosure sale and made payments to Society Hill. The debtors do not suggest that they are capable of reimbursing Perry for these sums; [19] and Perry's recovery from these third parties if the judgment were opened is doubtful. Thus, prejudice exists.

It is also difficult for me to conclude that the debtors possessed a meritorious defense to the foreclosure action. Essentially, they are requesting that I impose upon Perry what it declined to accept in March 1986: that all payments due Perry under the second mortgage created by settlement await Perry's completion of restoration work acceptable to plaintiffs. Not only do the settlement and mortgage documents contradict the existence of such a precondition, and not only would that materially alter the settlement negotiated by counsel and which resulted in the debtors' avoidance of foreclosure, but debtors' contention ignores Perry's later attempt in May 1986 to perform additional work. By not responding to this offer, while yet maintaining that such a precondition existed, the debtors would impose upon Perry a loan without a starting date for repayment. I cannot conclude on the record before me that the debtors assertion regarding their payments to Perry, especially after hearing testimony from their prior counsel, is supportable.

Finally, the entry of judgment can fairly be attributable at least in part to the debtors' failure to respond to notices sent by Perry and court orders served upon them. No notices sent by regular mail were ever returned, thus suggesting that the debtors received them. *See Hagner v. United States*, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861 (1932) (presumption of receipt); *In re*

*Ryan*, 54 B.R. 105 (Bankr.E.D.Pa.1985) (same). Their conscious refusal to accept any certified mail does not now allow them to argue that they were ignorant of what was transpiring; nor can Mrs. Brasby argue that notices should have been sent to another address, since she neglected to provide anyone with such an address. Moreover, she testified that she regularly traveled to Fern Street to gather her mail during her separation from her husband.

Whether their prior counsel was also culpable, as they suggest, is not the point. This is not a dispute where blame rests solely upon counsel. The debtors, by their inaction after notice, must bear some responsibility for the entry of the judgment against them.

### B.

Although the debtors have not so argued, I am aware of the decision of *McCarter v. Mitcham*, 883 F.2d 196 (3d Cir.1989) which suggests that a judgment entered after a party's noncompliance with a court order compelling discovery is not by default, but is on the merits. Arguably, a motion to open such a judgment should be considered under the factors set out in *Poulis v. State Farm Fire & Casualty Co.*, 747 F.2d 863, 868 (3d Cir.1984). *See In re Paolino*, 87 B.R. 366, 368 (Bankr.E.D. Pa.1988).

Without detailing the six factors made relevant in *Poulis* (i.e., party's personal responsibility; prejudice to adversary; history of dilatoriness; bad faith; meritoriousness of claim; effectiveness of alternative sanctions), there is a significant overlap with the traditional standard for opening judgment by default. For the reasons discussed above, and given the discretionary nature in applying the *Poulis* factors, I

---

vest a bona fide purchaser of title. *See Continental Bank v. Frank*, 343 Pa.Super. 477, 495 A.2d 565 (1985).

**19.** Exhibit D–14 contains the debtors' proposed chapter 13 plan and financial statement. Given their expenses, they state that they can devote only $192.33 per month for 60 months (the maximum length of time for a chapter 13 plan— 11 U.S.C. § 1322(c)) to plan payments. They also state that they will resume postpetition reg-

ular monthly mortgage payments to Society Hill and cure their prepetition arrearage to Society Hill. *See* 11 U.S.C. § 1322(b)(5). No portion of the proposed plan payments are to be used to pay Perry. Thus, it does not appear that the debtors could afford to repay Perry while meeting their obligations to Society Hill, were I to grant them their requested relief and set aside the foreclosure judgment and sale.

cannot conclude that the sanction imposed by the state court was improper, especially when the court provided notice of the proposed sanctions to the debtors as well as counsel and there was no response whatever from the debtors (to the motion for sanctions, to the orders granting the motion and entering judgment or to the foreclosure sale) until almost one year after judgment was entered.

### C.

 Finally, I reject the debtors' challenge to the propriety of the entry of the judgment and the notice given of the foreclosure sale by way of this motion to strike. As to the sheriff sale, the state execution rules were complied with, counsel of record was served, and Mr. Brasby was personally served with notice. (Mrs. Brasby could not be served physically since she informed no one that she had vacated the premises and did not disclose her then current residence. Service at her last known address under these circumstances, especially given her regular return to the realty to receive mail and messages, provides no basis to strike the judgment.) Similarly, service of the underlying court papers (including the order compelling discovery upon pain of judgment) were served upon the debtors as well as counsel. That they failed to respond is no basis to set aside the judgment and vacate the sale.[20]

### IV.

In conclusion, I must reject the debtors' efforts to undo their settlement with Perry and Society Hill and set aside the foreclosure judgment and sale. The motion to strike or open the judgment will be denied

and judgment will be entered in favor of defendants under 11 U.S.C. § 548(a)(2).

---

20. The debtors aver that the initial notice of foreclosure sent by Perry pursuant to 41 P.S. § 403 was defective, thereby requiring that the judgment in foreclosure be stricken. *See generally Main Line Federal Sav. & Loan Assoc. v. Joyce,* 632 F.Supp. 9 (E.D.Pa.1986). Perry used the form prescribed by the Pennsylvania Department of Banking, 10 Pa.Code § 7.4, and simply filled in the blanks. The only error suggested by debtors is that the address of mortgagee, Perry, was omitted from the text of the notice. This, they assert, invalidates the entire notice and subsequent judgment and foreclosure sale.

Assuming that the failure to raise this defect in the debtors' answer did not constitute a waiver, *cf. In re Vitelli,* 93 B.R. 889, 898–99, & n. 6 (Bankr.E.D.Pa.1988), I note that the notice did contain a telephone number regarding information and a return address on the accompanying envelope. The omission of Perry's address in the text, by itself, does not constitute an erroneous notice giving rise to the relief now requested by the debtors. *See also In re Vitelli; Federal National Mortgage Assoc. v. Woody,* 25 D. & C.3d 604 (C.P.Phila.1982).