**In re Levander McKEEVER and Elnora McKeever, Debtors.**

**Levander McKEEVER, et ux., Plaintiffs,**

**v.**

**Joe Ann McCLANDON, d/b/a BMJ Company, et al., Defendants.**

**Bankruptcy No. 89 B 13233. Adv. No. 90 A 00052.**

United States Bankruptcy Court, N.D. Illinois, E.D.

April 14, 1994.

Richard L. Hoffman, Palatine, IL, Vickie L. Pasley, Chicago, IL, for McClandon.

Donald E. Johnson, Hollis & Johnson, Chicago, IL, trustee.

David S. Yen, LAFC, Chicago, IL, for McKeever.

Michael Harvey, Wheaton, IL.

## MEMORANDUM OPINION AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

ERWIN I. KATZ, Bankruptcy Judge.

This cause came before the Court for trial on the amended complaint of Levander and Elnora McKeever ("McKeevers"), under Section 522 of the Bankruptcy Code, 11 U.S.C. § 522, seeking to avoid the tax sale of their residence to the tax purchaser, Joe Ann McClandon ("McClandon"). The amended complaint alleges, in Count I, that the tax sale is avoidable under Section 548 as a sale for less than reasonably equivalent value, and, in Count II, that the sale was defective as to an unsecured creditor, the former mortgagee, Michael Harvey, and thereby subject to attack under Section 544(b).

The allegations are set forth in this Court's opinion in *McKeever v. McClandon*, 132 B.R. 996 (Bankr.N.D.Ill.1991) (*McKeever I*). That opinion basically held that a tax sale is subject to attack under Section 548, and that in order to succeed under Section 544 the debtors would be required to allege and prove the existence of fraud.

The Debtors have since amended Count II to allege fraud. The Debtors pray that the tax sale be avoided, that the property be brought back into the estate, and that they be awarded their homestead exemption plus compensation for the rental value of the property since the date of their eviction.

The Court's jurisdiction to hear this matter derives from 28 U.S.C. § 1334 and General Rule 2.33(A) of the United States District Court for the Northern District of Illinois. It is a core matter under 28 U.S.C. § 157(b)(2)(H). The following constitutes the Court's findings of fact and conclusions of law in accordance with Fed.R.Bankr.P. 7052.

*Section 548*

The McKeevers resided at the property in question since 1972, accumulating a substantial amount of equity before becoming insolvent, failing to pay property taxes, and eventually losing the property in a tax sale. A synopsis of the material events established at trial follows:

In the instant case, the delinquent taxes at issue were for the tax year 1984; the tax lien of the county attached on January 1, 1984; the taxes were not timely paid; the delinquent taxes were sold at the annual tax sale on January 14, 1986, and a Certificate of Purchase creating a lien on the property was issued to the tax sale purchaser; the redemption period expired on August 10, 1988; an order for the issuance of a tax deed was entered on Au-

gust 30, 1988, and the defendant tax deed grantee paid the remaining delinquent amounts for a total payment of approximately $4,645.11; the tax deed was issued on September 8, 1988 and was thereafter timely recorded; the debtors were evicted from the property on April 15, 1989, and the debtors filed their Chapter 7 petition in bankruptcy on August 10, 1989.

*McKeever I,* 132 B.R. at 1007–08.

To prevail under § 548(a)(2), the McKeevers must establish: (1) a transfer of their property, (2) within a year prior to the filing of their bankruptcy petition, (3) for less than reasonably equivalent value, (4) at a time when they were insolvent. *Id.* at 1008. In *McKeever I,* this Court held that a transfer had occurred upon the expiration of the redemption period, within one year of the date of filing of the bankruptcy petition. *Id.* at 1010.

The Court finds that the McKeevers were insolvent [1] when the transfer occurred. They testified without rebuttal as to the nature of their indebtedness, and offered into evidence both bankruptcy schedules and itemized bills reflecting such indebtedness. The Court finds that at the time of the transfer the McKeevers had liabilities in the amount of $145,000.00. Their assets at that time, consisting only of the non-exempt equity in their home, worth no more than $12,500.00, and their non-exempt personal property, worth no more than $2,000.00, amounting to no more than $14,500.00.

■ The focus of the dispute as to Section 548 is the requirement that the McKeevers must establish that they received less than reasonably equivalent value for the transfer of their interest in their home. The Court finds that under the test espoused in *In re Bundles,* 856 F.2d 815, 824 (7th Cir.1988),

and supported in opinions from other circuits,[2] the transfer was made for less than reasonably equivalent value. Applying a case-by-case approach, the court in *Bundles* held that "in determining reasonably equivalent value, the court must focus on what the debtor received in return for what he surrendered." *Id.* It has been argued that this test, tracking the language and purpose of the Bankruptcy Code, would render nearly every tax sale an exchange for less than reasonably equivalent value. However, neither the Bankruptcy Code nor its legislative history indicates a congressional intent that tax collections be excepted from the trustee's avoidance powers. *U.S. v. Whiting Pools, Inc.,* 462 U.S. 198, 209, 103 S.Ct. 2309, 2315, 76 L.Ed.2d 515 (1983); *McKeever I,* 132 B.R. at 1012; *In re Lasser & Kahn,* 68 B.R. 492, 494 (Bankr.E.D.N.Y.1986).

In *Bundles,* the Seventh Circuit held that there is no conclusive presumption of value in favor of a purchaser in a foreclosure sale and that "reasonably equivalent value" is not limited to fair market value. The Court also noted some other factors to be considered in the mortgage foreclosure context that do not apply in a tax sale. For example, "whether there was a fair appraisal of the property, whether the property was advertised widely, and whether competitive bidding was encouraged." *Bundles,* 856 F.2d at 824. These considerations would be relevant in a mortgage foreclosure because the court's inquiry in that case is to determine whether all reasonable efforts had been expended to obtain a fair purchase price—i.e., whether the sale was "calculated not only to secure for the mortgagee the value of its interest but also to return to the debtor-mortgagor his equity in the property." *Id.* However, as discussed in *McKeever I,* the only purpose of a tax sale is for the taxing authority to obtain payment of its delinquent taxes at the lowest

---

**1.** 11 U.S.C. § 101(32) defines insolvency, in pertinent part, as—

"(A) ... financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—

(i) property transferred concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and

(ii) property that may be exempted from property of the estate under section 522 of this title."

**2.** *See In re Slack–Horner Foundries Co.,* 971 F.2d 577, 584 (10th Cir.1992) (Seymour, J., dissenting); *In re Grissom,* 955 F.2d 1440, 1445 (11th Cir.1992); *Barrett v. Commonwealth Fed. Sav. & Loan Ass'n,* 939 F.2d 20, 23–24 (3d Cir.1991); *In re Morris Communications NC, Inc.,* 914 F.2d 458, 466–67 (4th Cir.1990).

cost of redemption. There is no correlation between the sale price and the value of the property. Therefore, it will be a rare case where the taxes paid at a tax sale will approximate the actual value of the property. (*See McKeever I*, 132 B.R. at 1006–08, for discussion of Illinois tax sale procedure.)[3]

The McKeevers produced the testimony of a professional appraiser, Richard M. Munizzo. Munizzo testified, in accordance with his report, that the fair market value of the McKeevers' home in August 1988, when the transfer occurred, was $53,000.00. The only other evidence bearing on the value of the home is an agreement dated February 19, 1988, between McClandon and Ceola M. Banks, admitted into evidence as Plaintiff's Exhibit 18, wherein McClandon agreed to secure a tax deed to the residence and convey the property to Banks for the price of $31,000.00. It was clear to the Court that the McClandon/Banks venture was to acquire "a bird's nest on the ground,"[4] at a scavenger price. If the Court were to assume that both Banks and McClandon anticipated meaningful profit, the fair market value would then approach the $53,000 appraised value. McClandon testified that Banks took possession of the property approximately one month after the McKeevers were evicted, and has paid $27,000.00 towards the purchase price. Banks is withholding the balance pending the outcome of these proceedings.

Applying the *Bundles* test to facts of this case reveals that McClandon received a property with a fair market value of approximately $53,000 after paying the McKeevers' tax liability in the amount of $4,654.11. The Seventh Circuit, in *Bundles*, has enunciated the rule that reasonably equivalent value must consider all of the circumstances as of the time of the transfer. The reasonably equivalent value in this case would be somewhere between the $31,000.00 paid by Banks to McClandon and the fair market value of $53,000.00. The tax sale price is 17% of $31,000.00 and 9% of $53,000.00.

In determining whether a transfer was made for reasonably equivalent value, courts have analyzed the exchange from the perspectives of (1) the debtor, where the sale price is compared to the amount of the debtor's equity in the property, (2) the buyer, where the sale price is compared to the fair market value of the property, and (3) the market, where noncollusive sales conducted in compliance with the proper procedures are conclusively presumed to result in an exchange of reasonably equivalent value.[5] Where the analysis extends beyond procedural considerations, it usually centers around the percentage of either the equity or fair market value for which the property is sold. The first approach asks whether, at the time of the transfer, the estate, or the debtor in this case, got enough; the latter, whether the buyer got too much. To assist in this fundamental determination, the courts look into the particular circumstances pointed out in *Bundles*. The decision ultimately is whether, viewed at the time of the transfer, the estate could have realized a greater benefit from the transaction than it actually received; and, if so, whether the additional benefit is large enough to offset the costs associated with attaining it. As at least one court has observed, a test that is formulated on the basis of a percentage of either equity or fair market value, misses the real issue— net gain to the estate. *In re Smith*, 24 B.R. 19, 23 (Bankr.W.D.N.C.1982). *But see Matter of IPI Liberty Village Associates*, 92 B.R. 882, 884 (Bankr.W.D.Mo.1987) ("It is not for

---

3. Theoretically, such a scenario is possible. Taxes are assessed at a percentage of value at the time of assessment. If taxes remain unpaid for a number of years, so that a purchaser is required to pay those taxes additionally, and if the real estate market drops drastically, there could arise a tax sale where the accumulated cost of purchase equals the fair market value. The problem with that sale, of course, is that it will be a rare tax-sale purchaser who will bid at those numbers.

4. *SRSB–IV, LTD. v. Continental Sav. Ass'n*, 979 F.2d 39, 40 (5th Cir.1992); *Crown Life Ins. Co. v. Candlewood, Ltd.*, 112 N.M. 633, 638, 818 P.2d 411, 416 (1991); *Wright v. Cies*, 648 P.2d 51, 53 (Okla.App.1982); *Lile v. Pulaski County Bd. of Equalization*, 252 Ark. 508, 510, 479 S.W.2d 856, 857 (1972).

5. For discussions of the various approaches, *see In re Gutierrez*, 160 B.R. 788 (Bankr.W.D.Tex. 1993); *In re Brasby*, 109 B.R. 113 (Bankr. E.D.Pa.1990); *In re Hulm*, 45 B.R. 523 (Bankr. D.N.D.1984).

the bankruptcy courts to look at such transfers with an eye as to how much potential equity there is for the estate.") The purpose of Section 548 is to preserve assets of the estate. *Bundles*, 856 F.2d at 824; *see also In re Brasby*, 109 B.R. 113, 121 (Bankr. E.D.Pa.1990); *In re Lindsay*, 98 B.R. 983, 989 (Bankr.S.D.Cal.1989); *In re New Yorketown Associates*, 40 B.R. 701, 705 (Bankr. E.D.Pa.1984). It precludes a buyer from getting too good a deal from the debtor in the year leading up to bankruptcy. In the case at bar, at the time of the transfer, there was much more value in the McKeevers' home than the tax liability satisfied by McClandon. While Illinois law provides for the large profits associated with tax sales, and, indeed, offers such profits to tax purchasers as an incentive to pay delinquent taxes, under bankruptcy law bargain basement "steals" are subject to recall.

Upon the expiration of the redemption period, the McKeevers lost the equity in their home in exchange for the release of their obligation to pay delinquent taxes in the amount of $4,654.11. That equity value is calculated by subtracting existing liens from the fair market value. The only encumbrance on their home, aside from the tax lien, at the time of the transfer was a mortgage in favor of Defendant Harvey in the amount of $21,000.00. Therefore, the McKeevers gave up their equity of $27,346.00 in exchange for the release of an obligation of $4,654.11. The value of what they received is 17% of what they lost. They received less than reasonably equivalent value, and the transfer, to the extent of their exemption, may be avoided.[6]

The Court declines to follow McClandon's suggestion that the McKeevers received value upon the issuance of the tax deed in the amount of an indemnification action under Section 247a of the Illinois Revenue Act of 1939. *See* 35 ILCS 205/247a (West 1993).[7] While the Court does not assess the viability of such an action, it regards as disingenuous the argument that the greater an injury inflicted on a debtor, and the stronger the resulting cause of action, the greater the value that has been given to the debtor. Such reasoning would lead to rather absurd results. Therefore, the only value the McKeevers received in exchange for their interest in their home was the release of their tax liability, which, as stated above, was not the reasonably equivalent value of their interest in the property.

*Section 544(b)*

■ The McKeevers have not established that they are entitled to set aside the tax sale under 11 U.S.C. § 544(b). This section allows the trustee to avoid transfers by invoking applicable state law on behalf of an unsecured creditor. In the case at bar, the McKeevers argue that an unsecured creditor, Harvey, whose security interest was extinguished by the tax sale, was entitled to set the sale aside. The McKeevers allege that Harvey was not properly served with notice of the expiration of the redemption period, and that McClandon's representations to the state court regarding service amount to fraud.

---

6. *See Durrett v. Washington Nat'l Ins. Co.*, 621 F.2d 201, 203–04 (5th Cir.1980) (57.7% of property's value is not reasonably equivalent value); *In re CF Realty*, 160 B.R. 461 (Bankr.D.N.H. 1993) (tax sale avoided under § 548(a)(2) where tax liability amounted to 4.5% of the debtor's equity in property); *In re Hernandez*, 150 B.R. 29 (Bankr.S.D.Tex.1993) (tax sale set aside where tax liability amounted to 38% of the value of the property); *In re Butler*, 75 B.R. 528, 531 (Bankr. E.D.Pa.1987) (debtors received less than reasonably equivalent value where property transferred for 57.3% of its value), *rev'd on other grounds, Butler v. Lomas and Nettleton Co.*, 862 F.2d 1015 (3d Cir.1988). *But see In re War Eagle Floats, Inc.*, 104 B.R. 398 (Bankr.E.D.Okla.1989) (tax sale was not set aside where price paid was less than 50% of the property's fair market value).

7. Section 247a provides in pertinent part:

(5) Any owner of real estate sold pursuant to any provision of this Act at a sale held subsequent to September 1, 1970, who without fault or negligence of his own sustains loss or damage by reason of the issuance of a tax deed pursuant to Sections 266 or 266a, and who is barred or in any way precluded from bringing an action for the recovery of such real estate or any owner or property containing four or less dwelling units who resided thereon the last day of the period of redemption who, in the opinion of the Court which issued the tax deed order, is equitably entitled to just compensation, has the right to indemnity for the loss or damage sustained. Indemnity shall be limited to the fair cash value of the real estate as of the date that the tax deed was issued, less any mortgages or liens thereon.

In Illinois, tax sales may be set aside only in limited situations. 35 ILCS 205/266 provides in pertinent part:

Tax deeds issued pursuant to this Section are incontestable except by appeal from the order of the court directing the county clerk to issue the tax deed. However, relief from such order may be had under Section 2–1401 of the Code of Civil Procedure in the same manner and to the same extent as may be had under that Section with respect to final orders and judgments in other proceedings. However, the grounds for relief shall be limited to a showing by clear and convincing evidence that the tax deed had been procured by fraud or deception by the tax purchaser or his assignee, that the taxes were paid prior to sale, or that the property was exempt from taxation.

This Court stated in *McKeever I* that to prevail under this section, "[t]he petitioner must demonstrate some specific fraudulent act or course of conduct, such as the deliberate failure to serve a known party in addition to intentional concealment of that information from the court." 132 B.R. at 1015. McClandon's actions in obtaining the tax deed do not amount to fraud.

Harvey was identified as a party in interest in the state court proceedings and in a notice published in the *Chicago Law Bulletin.* Harvey did not testify in these proceedings. The Debtors assert that Harvey did not receive notice and had no knowledge of the pending tax deed proceedings. For the purpose of this discussion, we assume Harvey did not receive notice. McClandon instructed the sheriff to serve notice to Harvey at the McKeevers' residence, the property that was the subject of the tax proceedings. In the tax proceedings she introduced the sheriff's return of service, indicating that substitute service had been effected on Harvey's husband at the specified address. The return of service was also admitted into evidence in the current proceeding. McClandon testified both in state court and before this Court that she learned Harvey was an interested party entitled to notice from a printout she obtained from the Chicago Title Insurance Company. She testified that she ascer-

tained his address from a document that was not produced in this proceeding, and from a conversation she had with an occupant of the premises that she assumed was Harvey. She testified that she sought to verify the address from telephone directories but was unable to find a listing for a Michael Harvey in the Chicago telephone books.

The McKeevers argue that McClandon fabricated the account of her inquiry into Harvey's address; and that the state court would not have issued the tax deed in the first place absent her misrepresentations. They point to the fact that the document from which McClandon supposedly ascertained Harvey's address was never produced. They introduced testimony that the man with whom McClandon supposedly spoke was mute. They produced a page from a telephone directory listing Harvey at an address in Wheaton, Illinois, a suburb of Chicago. They also argue that Harvey's address was available both in Sullivan's Law Directory and on the face of the mortgage recorded with the Recorder of Deeds for Cook County. Thus, the McKeevers contend that McClandon's testimony before the state court was intended to deceive the court regarding the adequacy of notice, for the purpose of obtaining the tax deed.

This Court held in *McKeever I* that the allegation that McClandon did not conduct a diligent inquiry into Harvey's mailing address was, in itself, an insufficient basis for setting aside a tax sale. 132 B.R. at 1015. Therefore, the sole question is whether she obtained the tax deed fraudulently. While McClandon's testimony before the state court may be characterized as ambiguous, and her search incomplete, the Illinois Supreme Court has held that facts such as those presented herein do not provide a basis for setting aside a tax sale. McClandon's testimony before the state court indicates confusion on her part, but not an intention to either conceal Harvey's identity or deceive the court. The relevant testimony ensues:

THE COURT: How did you determine Michel Harvey's address?

MS. McCLANDON: Because, on the original file, he was listed as being at 9021 South Bishop. He was still listed ...

THE COURT: The Sheriff's return shows there is a Michel Harvey living there.

MS. McCLANDON: Yes, we served him.

THE COURT: You served Michel Harvey—is that a male or female?

MS. McCLANDON: Well, it shows "husband."

THE COURT: The sheriff's return indicates "husband."

MS. McCLANDON: So, it is a female. It is Michel F. Harvey, female, black.

THE COURT: But, your representation is that they don't really live there, as far as you know?

MS. McCLANDON: As far as I know. We were never given that information.

When we talked to the neighbors they said the McKeevers lived there and they were not even aware of this other name that was given.

But, the Sheriff's notice said she was served and we did add her in our publication.

(Transcript of state court proceedings dated August 26, 1988, pages 8–11) McClandon's uncertainty regarding Harvey's address was elicited through the court's inquiry. It is apparent that the judge was willing to rely on the sheriff's return of service and notice by publication.

■ The Illinois Supreme Court has held that without proof of fraud, proof that an interested party did not receive notice was insufficient grounds to set aside a tax sale, notwithstanding that the taxpayer represented to the court that service had been effected. *Application of County Treasurer of Cook County*, 92 Ill.2d 400, 405–06, 65 Ill.Dec. 905, 442 N.E.2d 216 (1982) (*Congua*); *Smith v. D.R.G., Inc.*, 63 Ill.2d 31, 37, 344 N.E.2d 468 (1976); *Zeve v. Levy*, 37 Ill.2d 404, 409–10, 226 N.E.2d 620 (1967); *Urban v. Lois, Inc.*, 29 Ill.2d 542, 548, 194 N.E.2d 294 (1963). Fraud has been defined in this context as an act calculated to deceive. *Congua*, 92 Ill.2d at 405, 65 Ill.Dec. 905, 442 N.E.2d 216; *Dahlke v. Hawthorne, Lane & Co.*, 36 Ill.2d 241, 245, 222 N.E.2d 465 (1966). In *Congua*, where notice was published for

three days in the Chicago Law Bulletin, the sheriff erroneously failed to serve an interested party, and the tax purchaser and the court issuing the order for the deed relied on the sheriff's erroneous return, the court held that the deed had not been procured by fraud. The court held that "merchantability of tax titles would be impaired if errors by the sheriff in service of notice, without proof of fraud, were held to be sufficient grounds to [set aside the tax sale]." *Congua*, 92 Ill.2d at 408, 65 Ill.Dec. 905, 442 N.E.2d 216.

In *Exline v. Weldon*, 57 Ill.2d 105, 311 N.E.2d 102 (1974), the former owners of property that was transferred in a tax sale, argued that the tax purchaser had perpetrated a fraud upon the court by misrepresenting its compliance with the notice requirements. The court held that there was no fraud on the court where the party who was not served was identified and the party did not establish that the failure to notify other than by publication indicated a pattern of deception. *Id.* at 111, 311 N.E.2d 102. As in the present case, the tax purchaser's testimony at the hearing on the petition for issuance of the tax deed was characterized as ambiguous. In addition, the tax purchaser testified that a diligent search for interested parties had been made in telephone directories. It turned out, however, that he had searched only Chicago listings, and failed to search a suburban telephone book where the former owners were listed. The court stated that the tax purchaser:

... claimed that he had checked the listings in Chicago, which is the largest urban unit within Cook County. His failure to inspect the remaining telephone directories, which list many of that county's telephone subscribers, is no more indicative of deception than was the failure to check the Torrens records in *Shapiro v. Hruby*, 21 Ill.2d 353, 172 N.E.2d 775.

*Id.* The court further found that the purchaser's failure to inquire into the former owners' address from their attorney, whose name and address appeared on the deed as the notary and the person to whom the deed was to be mailed after recording, was also an insufficient basis upon which to set aside the sale.

In the present case, where McClandon's testimony was ambiguous, her search of telephone directories cursory, and her search for Harvey's correct address minimal, absent proof of an intent to deceive, her acts are not enough to constitute fraud. Additionally, the Court notes that Harvey is an attorney who, not only sold the McKeevers the property in 1972, and loaned them the money to redeem it in foreclosure proceedings, but also represented them in another property-related dispute prior to the tax proceedings and afterwards, when they filed their bankruptcy petition. Mr. McKeever testified that he spoke to Harvey in 1987 after having received letters regarding the delinquent taxes. Harvey's experience as an attorney and his prior involvement with the property were at least notice that the property was in danger of being lost.

The cases from the Illinois appellate courts offered by the McKeevers in support of their position are distinguishable on the facts. To the extent that *In re Tax Deed Petition of Thomas,* 225 Ill.App.3d 861, 167 Ill.Dec. 368, 587 N.E.2d 637 (4th Dist.1992), *cert. den.* 145 Ill.2d 634, 173 Ill.Dec. 5, 596 N.E.2d 629, supports their position, the Court relies on the weight of the Illinois Supreme Court decisions in this area.[8] In *Thomas,* the court held that where the tax purchaser erroneously determined that a mortgagee's mortgage had been released and thereafter failed to provide it with notice of the redemption deadline, fraud was deemed to exist as a matter of law. However, in *Thomas,* the mortgagee was not identified as an interested party either in the purchaser's petition or in a notice by publication. Harvey was identified as an interested party. The state court was apprised of his interest, and he was listed in the notice published in the *Chicago Law Bulletin.* Moreover, the court in *Thomas* distinguished the facts under its consideration from the facts in *Congua,* where the tax purchaser relied on an erroneous sheriff's return.

Likewise, in *Application of the County Collector,* 202 Ill.App.3d 405, 147 Ill.Dec. 666,

559 N.E.2d 1006 (1st Dist.1990) (*Capitol*), the interested party was never identified. No attempt was made to serve the interested party by any means. In *Capitol,* the purchaser misrepresented in its affidavit to the state court that it had searched the public records to ascertain the identity of all interested parties. While the court stated that a tax purchaser could not rely on a search for interested parties performed by Chicago Title Insurance Company, the focus of the court's concern was on identifying interested parties. The court distinguished prior case law requiring a showing of fraud by stating "none of the cases involved facts where, as here, a materially interested party was never even identified from the public records, through the fault of the tax petitioner." *Id.* at 412, 147 Ill.Dec. 666, 559 N.E.2d 1006.

In *Application of County Treasurer,* 67 Ill.App.3d 122, 23 Ill.Dec. 822, 384 N.E.2d 729 (1st Dist.1978), the tax purchaser withheld from the court the names and addresses that appeared on the face of a quitclaim deed for the property. One of the parties listed was the attorney to whom the deed was mailed. The other was the owner of the property, to whom it was indicated that subsequent tax bills should be sent. The court also found that the tax purchaser purposely withheld tax deed bills from the court in order to conceal the name and address of the owner. The court held that fraud had been committed against the court and the owner of the property when the purchaser intentionally concealed information in her possession regarding parties to be served. There is no evidence before this Court that McClandon purposely concealed Harvey's name and correct address from the state court. She was remiss in not discovering his correct address. As the McKeevers point out, his correct address appeared in a telephone directory for the Chicago suburbs, in Sullivan's Law Directory, and on the face of his mortgage which was recorded. The McKeevers charge that a proper search was not conducted. They do not charge, however, that McClandon was in possession of Harvey's correct

---

8. *See Robinson v. Ada S. McKinley Community Services, Inc.,* 19 F.3d 359, 363 (7th Cir.1994) ("We will not follow an Illinois Appellate Court's interpretation of state law if we are convinced that the Illinois Supreme Court would decide the issue differently.")

address and intentionally withheld it from the court.

In *Application of the County Collector*, 26 Ill.App.3d 234, 325 N.E.2d 15 (3d Dist.1975), the court held that the purchaser obtained the tax deed by fraud when it made no attempt whatsoever to locate the non-resident owner and failed to provide notice by publication. The court distinguished the facts before it from *Exline, Zeve* and *Dahlke,* where, in each case the owner was served by publication and the purchaser had made some attempt to locate the owner by speaking with the occupants of the property, checking a telephone directory or mailing notice. *Id.* at 238, 325 N.E.2d 15. In the present case, notice was served to Harvey by publication, and the sheriff's return of service indicated that substitute service had been effected on Harvey. As this Court stated in *McKeever I,* "[f]ailure to make a more thorough inquiry or search for interested parties, mistaking the nature of occupancy of the tax deed property, omitting a party, or serving the wrong party have all been held not to constitute fraud sufficient to set aside a tax deed proceeding on collateral attack." 132 B.R. at 1015.

*Relief*

■ Because the McKeevers have shown that a trustee could have set aside the transfer under 11 U.S.C. § 548, they are entitled under Section 522 to avoid the transfer to the extent of their homestead exemption. The Illinois homestead exemption provides in pertinent part: "Amount. Every individual is entitled to an estate of homestead to the extent in value of $7,500 . . ." 735 ILCS 5/12–901 (1993). Under this section, a husband and wife may claim homestead exemptions of $7,500 each for a combined total of $15,000. *First Nat'l Bank of Moline v. Mohr,* 162 Ill.App.3d 584, 587, 114 Ill.Dec. 85, 515 N.E.2d 1356 (1987); *see also Matter of Szekely,* 936 F.2d 897, 902 (7th Cir.1991) (the homestead estate is limited by the value of the exemption); *McKeever I,* 132 B.R. at 1002 ("[T]he debtors could have exempted a homestead estate in value of $7,500 each under Illinois law if there had been no tax deed issued. Under the literal language of § 522(h), therefore, the debtors may avoid

the transfer to that extent.") Therefore, the McKeevers are entitled to the value of their exemption in the amount of $15,000.00.

The McKeevers argue that they are entitled to $15,000.00 plus the rental value of the premises since the date they were displaced. In *Szekely* the court ruled that a Chapter 7 trustee could not evict a debtor until the debtor was paid the cash value of his exemption. *Szekely* does not expand the homestead exemption. That court dealt only with the trustee's right to possession. The McKeevers seek more; they seek rental plus the homestead. *Szekely* does not mean, however, that when debtors have already been evicted pre-bankruptcy, before they receive their exemption, and have been successful in finding less expensive living accommodations in the interim, they can enlarge the value of the exemption by claiming they are entitled to reimbursement.

In *Szekely,* the court stated that "[t]he homestead exemption, perhaps especially when as here it is capped at a relatively modest sum of money, is designed to assist the debtor *to the extent of the exemption* to obtain more modest living quarters." *Szekely,* 936 F.2d at 902–03. Here, under Illinois law, the McKeevers had no exemption available to them arising from the tax sale. The McKeevers' right to the homestead exemption only arises once the sale is set aside. *See McKeever I,* 132 B.R. at 1001. Therefore, they suffered no damages as a result of being wrongfully dispossessed of their property. Moreover, they testified before this Court that they were successful in finding more modest living quarters, albeit without the assistance of the exemption, and in fact spent most of the time since they were evicted living across the street from their former residence.

If the McKeevers now recover the full amount of their exemption, they cannot argue that their exemption has been diminished. In *Szekely,* the court expressed concern that the debtors' exemption would be diminished if the trustee were allowed to deduct rent for the time they remained in possession of the premises. The court was also concerned that the debtors would obtain a windfall if they were allowed to remain in the

premises rent-free. It concluded that allowing the debtor to remain in possession rent-free would give the trustee an incentive to pay the exemption; and that it would defy the purpose of the exemption to force the debtors to leave the property without any resources to find alternative housing. Here, however, allowing the McKeevers to receive the rental value of their former residence since the time they were evicted, above the full amount of the exemption, would bestow a windfall upon them.

Because Section 522 limits the McKeevers' avoidance to the extent of their exemptions, any interest in property arising in favor of McClandon under either Section 548(c) or Section 550(d) is protected by the value of the property.[9] Additionally, because of the limited relief available under Section 522, the Court finds no cause to rule on the interests of the remaining defendants, Michael F. Harvey and Lakeshore National Bank, prior mortgagees who presented neither arguments nor evidence at trial. This Court found in *McKeever I* that "to the extent the amended complaint seeks to assert the trustee's avoidance powers in excess of the homestead exemption, the complaint fails to state a cause of action upon which relief can be granted and that portion of the complaint shall be dismissed." 132 B.R. at 1004.

■ For the reasons stated above, judgment in the amount of $15,000.00 shall be entered against McClandon in favor of the McKeevers.[10] Section 550, under which the McKeevers recover their exemptions, allows the court to order the return of either the property itself or the value of the property to the extent that the transfer is avoided.[11] Because McClandon is already in possession of the property, which has been valued well in excess of the aggregate of the McKeevers'

exemptions and the tax liabilities she satisfied, the Court finds that the interests of the parties are best preserved by entering judgment in the amount of the exemptions rather than by conducting a judicial sale.

*Conclusion*

To the extent of their homestead exemptions in the amount of $7,500.00, the McKeevers may avoid the tax sale of their former residence as a transfer for less than reasonably equivalent value under 11 U.S.C. § 548(a)(2). However, the McKeevers have not shown that McClandon obtained the tax deed by fraud, and therefore they may not avoid the transfer under 11 U.S.C. § 544(b). Judgment will be entered in the Court's Final Judgment Order of even date against McClandon, in favor of Levander McKeever in the amount of $7,500.00 and in favor of Elnora McKeever in the amount of $7,500.00.

---

9. Of course, had the trustee joined·in this adversary and recovered the balance under Section 551 on behalf of the estate, the result might have been different.

10. The court in *Szekely* stated:

The interaction of bankruptcy law and the homestead exemption made the [debtors] in effect cotenants, with the trustee, of the [debtors'] former house. The trustee was entitled to obtain sole rights to the property by paying off the homestead exemption—in effect a partition of the

property in which the [debtors] would receive $15,000 ...
*Szekely,* 936 F.2d at 903.

11. Section 550 provides in pertinent part:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 548 ... the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
(1) the initial transferee ...